MRS. CARRIE LEWIS SIMPSON v. THE AMERICAN OIL COMPANY AND BOON-ISELEY DRUG COMPANY.

(Filed 8 May, 1940.)

**1. Sales § 17—**

Where a manufacturer of an insecticide prints on the container designed for sale to the ultimate consumer statements that the product is not poisonous to human beings, such statement, since it is made for the purpose of inducing the purchase of the article, constitutes a warranty from the manufacturer to the consumer, and the consumer may maintain an action against the manufacturer for breach of such warranty.

**2. Sales § 14—**

Evidence that insecticide manufactured for use as a spray indoors resulted in inflammation, boils and sores on the body of plaintiff where the substance touched her body when she used the spray as directed, is sufficient to show that the insecticide was "poisonous" as to the plaintiff within the meaning of that term as used in the manufacturer's warranty.

**3. Election of Remedies § 1—**

If defendant deems that plaintiff is attempting to recover on two inconsistent theories of liability, defendant must move that plaintiff be required to make his election.

**4. Damages § 13—**

Plaintiff alleged a cause of action in contract and in tort to recover for personal injuries alleged to have been caused by an insecticide manufactured by defendant.   The charge of the court on the issue of damages *is held* to contain prejudicial error in being susceptible to the construction that the damages sustained might be found separately under the issue of negligence and under the issue of breach of warranty, and added together, thereby permitting two recoveries for one injury.

CLARKSON, J., concurring.

APPEAL by defendant American Oil Company from *Williams, J.,* at January Term, 1940, of WAKE.   New trial.

(During the course of the trial a voluntary nonsuit was taken as to the defendant Boon-Iseley Drug Company.)

The plaintiff brought action against the American Oil Company and Boon-Iseley Drug Company to recover for injuries which she alleges she

SIMPSON *v.* OIL CO.

received from the poisonous effect of an insecticide, the spray of which had settled upon various portions of her person and had caused inflammation, pustules and boils of a serious and recurrent nature.

Plaintiff complained that her eyesight was affected, permanent organic injuries had resulted, a serious nervous condition brought on, with occupational loss and mental anguish.

Defendants denied the substantial allegations of the complaint, maintained that the preparation manufactured by the defendant Oil Company and sold by the defendant Drug Company was nontoxic as far as humans were concerned, and did not produce the condition complained of, and averred that plaintiff's condition, whatever it was, was not the result of any negligence or want of duty, contractual or otherwise, on their part.

The plaintiff's evidence tended to show that she had purchased of the defendant Boon-Iseley Drug Company a can of insecticide, or insect eliminant, distributed by the defendant American Oil Company under the trade-name "Amox," upon which the following statements and guarantees were printed: "For Best Results use *Amox* hand Sprayer—How to Use Amox—The 100% Active Insecticide. Amox is made for the purpose of killing insects, it is not poisonous to human beings, but is sure death to insects. Amox Liquid Spray is non-poisonous to human beings, but is not suited for internal use. Do not spray on food or plants. Note with all its insect killing power Amox may be used freely indoors."

That plaintiff on the day of the purchase, after having carefully read the instructions, proceeded in accordance therewith and sprayed her studio at No. 110½ Fayetteville Street, in the city of Raleigh, with the insecticide, spraying the furniture and under the mantel; that it was intensely warm at that time and plaintiff was thinly clad, and in the process of spraying a small portion of the spray came in contact with her body, especially upon her shoulders, bust and breast; that on the next day she became nauseated and felt suffocated, and collapsed in the midst of a music rehearsal, trembling and perspiring.to such an extent that large drops covered her body. This recurred the next day, and almost immediately thereafter she began to have an itching and burning sensation on her chest and bust, and, upon examination, she found that her body had become inflamed and red, and on the next day boils and sores manifested themselves over her whole bust. Plaintiff sought medical advice but grew rapidly worse, the sores and boils increasing in intensity for many weeks, until finally her eyes became affected and the tissues surrounding them became greatly swollen. There was much further evidence as to the condition of the plaintiff, both physically and mentally, which she attributed to the effect of the insecticide which she had used. Mrs. Simpson's testimony was corroborated by her husband, Frank B. Simpson.

Dr. Michael Bolus, a skin specialist, corroborated Mrs. Simpson as to her symptoms and condition, and further testified that he had tried a number of infectious substances upon her, from which he got no reaction, but did try Amox and got reaction; that the Amox test was that which was generally employed for purposes of that kind. It indicated that she was sensitive to Amox, or, rather, that Amox was poisonous to her. Pursuing his investigation, he tested a number of persons at the State's Prison, including a doctor, two nurses and two orderlies, all of whom reacted to the Amox.

On cross-examination he testified that in the test on Mrs. Simpson he was looking for an allergy or hypersensitiveness and found that she was very sensitive to Amox; that she reacted worse to it than did the five men he had tested. He further testified that a volatile substance like Amox would probably evaporate if not covered before reaction took place. This witness testified extensively upon the subject of allergy and allergic sensitivity to various substances.

L. V. Kiger and John P. Wood, witnesses for plaintiff, corroborated Mrs. Simpson as to her collapse in the studio.

W. W. Hinnant testified that he operated the Atlantic Tobacco Company in Raleigh, which company handled Amox, which was purchased from American Oil Company. He sold the Boon-Iseley Drug Company a lot on 26 April, 1937. It was packed in 12 dozen six-ounce cans, six dozen pints and six dozen quarts. It was sold in the same container in which it was received, that is, it was sold to Boon-Iseley Drug Company in the original case just as it came from the American Oil Company.

Photographs of the body of Mrs. Simpson were exhibited.

R. I. Blackwell, owner of Boon-Iseley Drug Company, testified that he purchased the box of Amox from the Atlantic Tobacco Company, all at one time. All the Amox he had in stock came from the Atlantic Tobacco Company. This witness identified a number of prescriptions from various physicians for skin lotions to be used by Mrs. Simpson and testified that it might have been used for eczema, which the evidence tended to show had been for some time on the plaintiff's ankle.

At the conclusion of the plaintiff's evidence, the defendant moved for judgment as of nonsuit, which motion was overruled, and defendant excepted.

The defendant introduced evidence in rebuttal, Dr. C. C. Carpenter testifying that he had sprayed Amox on 62 students at Wake Forest College, spraying the Amox on the naked arms, after which the sleeves were rolled down and the students went on in their usual manner as if nothing had happened, and then made observations at the end of twenty-four and forty-eight hours, and observed no harmful effects whatever.

The arm was sprayed on the inner surface because it was the normal, sensitive, tender area and the clothing could well drop over it in a convenient way. Witness was of the opinion that the Amox was not in any way harmful to the human being, basing this on his own experience with the material. He did not interpret the word "poisonous" as applicable to Amox.

The defendant renewed his motion for judgment of nonsuit at the end of all the evidence and the motion was overruled, and defendant again excepted.

Upon the verdict, the court signed a judgment for $5,000, from which the defendant appealed, assigning errors.

*Douglass & Douglass and John W. Hinsdale for plaintiff, appellee.*
*Ruark & Ruark for defendant American Oil Company, appellant.*

SEAWELL, J. 1. We do not regard the exceptions to the admission of evidence as meritorious, and refrain from detailed expression of opinion in that connection.

2. The more serious challenge which the defendant makes to the plaintiff's position in this appeal is to the submission of the first issue relating to the supposed warranty of the manufacturer and distributors in the sale of the product "Amox," and the charge of the judge relative thereto, in which he finds such warranty might exist.

The printed matter on the can of Amox described it as "100% active insecticide," and recommends its use in a hand sprayer, from which, of course, in the nature of things, it is expected to commingle freely with the atmosphere of the room in which it is used for at least an extensive space.

It is further stated that "Amox is made for the purpose of killing insects, it is not poisonous to human beings, but is sure death to insects." "Amox Liquid Spray is non-poisonous to human beings, but is not suited for internal use. Do not spray on food or plants." "Note with all its insect killing power Amox may be used freely indoors."

We are not disposed to entertain medico-legal technicalities on the definition of the word "poisonous" or the word "poison." It has a popular as well as, perhaps, a technical significance. Not conceding that the technical significance would not cover a substance the contact of which would produce violent alterations in the cell structure, normal metabolism and healthy functioning of any portion or organ of the body, including the skin, we may easily understand that when the word appears as a label upon products intended for popular consumption and use, it has its popular significance. In Funk & Wagnall's Dictionary "poison" is defined as "any substance that when taken into the system acts in a

18—217

noxious manner by means not mechanical, tending to cause death or serious injury to health." Century Dictionary: "Any substance which by reason of an inherent deleterious property tends to destroy life or impair health when taken into the system." No one would deny that the toxic properties of poison ivy or poison sumac brought into the system by external contact with the skin, constitute poison in this popular sense, and we do not doubt in strict medical terminology.

Featuring prominently in this case are the doctrines of warranty and of negligence. As to the first, it is argued by appellant that this case is controlled by *Thomason v. Ballard & Ballard Co.,* 208 N. C., 1, 179 S. E., 30. But the situation in this case is somewhat different from that in the *Ballard case, supra,* and the distinction in the facts involved is sufficient to mark a distinction also in principle. In that case the Court had nothing before it but the sale of a food product by the wholesale dealer to the retail dealer, with such implications as might arise from that transaction. The Court simply held that the purchaser from the retail dealer was neither party nor privy to the contract between the vendor and vendee and, therefore, could not avail himself of any warranty that may have existed between them. This was by no means an intimation that the original manufacturer and distributor might not warrant his product to the ultimate consumer in such a way as to make a breach of that warranty actionable.

Here we have written assurances that were obviously intended by the manufacturer and distributor of Amox for the ultimate consumer, since they are intermingled with instructions as to the use of the product; and the defendant was so anxious that they should reach the eye of the consumer that it had them printed upon the package in which the product was distributed. The assurances that the product as used in a spray was harmless to human beings while deadly to insects was an attractive inducement to the purchaser for consumption, and such purchase in large quantities was advantageous to the manufacturer. We know of no reason why the original manufacturer and distributor should not, for his own benefit and that, of course, of the ultimate consumer, make such assurances, nor why they should not be relied upon in good faith, nor why they should not constitute a warranty on the part of the original seller and distributor running with the product into the hands of the consumer, for whom it was intended. Upon the evidence in this case, it must be so regarded.

3. After having proceeded upon the theory of negligence, the plaintiff was permitted to amend her pleading and pursue the warranty. We need not consider here whether the two theories are incompatible. No motion was made by the defendant that the plaintiff be required to elect between them. *Quære* whether the subsequent allegation of injury be- ·

cause of breach of warranty might not have had the effect of such election.

But the trial judge gave an instruction in this connection which we cannot sustain. Following his instructions on the first and second issues, relating respectively to warranty and negligence, and addressing himself to the issue of damages, he said: "If you answer both the first and second issues 'Yes,' then you will add to that sum of money which you may find under the rule just laid down such as you may find under the rule first stated." Reading the instructions to which this observation refers, we think the jury might have inferred that they would be permitted to find separate damages as to each of these issues and add them together in answer to the issue as to damages.

The plaintiff is seeking recovery for one damage sustained as a consequence of her injury and is, of course, entitled to no more.

We think this instruction erroneous, and there must be a

New trial.

CLARKSON, J., concurring: I concur in the able and well written opinion of *Mr. Justice Seawell.* The opinion refers to *Thomason v. Ballard & Ballard Co.,* 208 N. C., 1. I wish to reiterate here a part of my dissent in that case: "The weight of authorities, I think, holds that an implied warranty will lie in cases such as the case at bar. In 26 C. J., 785, it is said: 'It is generally agreed by the authorities that a manufacturer, packer, or bottler of foods or beverages is directly liable to a consumer for an injury caused by the unwholesomeness or the unfitness of such articles, although purchased from a dealer or middleman and not from such manufacturer, bottler, or packer.' The modern doctrine is stated in 11 R. C. L., 1122, as follows: 'In the case of food sold in cans, bottles, and sealed packages, some of the earlier decisions denied the right of the consumer to recover from the manufacturer, it appearing that the goods were purchased through the medium of a retail dealer. . . . A great majority of the more recent cases, however, hold that the ultimate consumer of products sold in cans or sealed packages may bring his action direct against the packer or manufacturer.' 17 A. L. R., 688; 39 A. L. R., 995; 63 A. L. R., 343; 88 A. L. R., 531; *Dothan-Chero-Cola Co. v. Weeks,* 80 So., 734 (Ala.); *Davis v. Van Camp Packing Co.,* 176 N. W., 382 (Iowa); *Parkes v. C. C. Yost Pie Co.,* 144 Pac., 202 (Kan.); *Meshbessher v. Channellene Oil Co.,* 119 N. W., 428 (Minn.); *Chesnault v. Houston Coca-Cola Bottling Co.,* 118 So., 177 (Miss.); *Tomlinson v. Armour,* 70 Atl., 314 (N. J.); *Nock v. Coca-Cola Bottling Works of Pittsburgh,* 156 Atl., 537 (Pa.); *Mazetti v. Armour,* 135 Pac., 633 (Wash.). . . . As pointed out in *Ward Baking Co. v. Trizzino,* 161 N. E., 557 (Ohio), there is no doubt that an implied warranty

arises between the groceryman who makes the purchase and the manufacturer. The groceryman did not make the purchase for himself, but for his customers, who are the ultimate consumers. The groceryman is merely the distributing agent, he has no opportunity to make an inspection of a sealed package and the manufacturer is fully aware of that fact. The contract between the manufacturer and the retailer is one for the benefit of a third party, the ultimate consumer. If there is any implied warranty between the manufacturer and the retailer, and there is no conflict of decisions on that point, then it is for the benefit of the third party, the ultimate consumer. Therefore, I fully agree with the holding in *Ward Baking Co. v. Trizzino, supra,* that an implied warranty for the benefit of an ultimate consumer of a food product can be relied upon by such ultimate consumer against its maker, who supplied it to the store for resale to the public, upon the ground that 'there is imposed the absolute liability of a warrantor on the manufacturer of articles of food, in favor of the ultimate purchaser, even though there are no direct contractual relationships between such ultimate purchaser and the manufacturer.' It is of the greatest importance to the health of the general public that when they purchase food or drink it should be pure, wholesome, and fit for use. It is a hard measure and almost impossible to prove negligence and by weight of authorities, this rule under modern conditions is fastly growing obsolete. The true rule, in more recent decisions, is that there is an implied warranty from the manufacturer to the consumer, the general public, where there is no opportunity to inspect, that the food or drink is pure, wholesome, and fit for consumption."