PERFECTING SERVICE COMPANY, a CORPORATION v. PRODUCT DE-
VELOPMENT AND SALES CO., a CORPORATION, AND RADIATOR
SPECIALTY COMPANY, a CORPORATION.

(Filed 22 May 1963.)

### 1. Appeal and Error § 41—

Where the record does not show what the answer of the witness would
have been, the Supreme Court cannot hold that the exclusion of the testi-
mony from the jury was prejudicial.

### 2. Evidence § 42—

In order to be competent, the testimony of an expert must be based
upon sufficient data; thus, when the crucial question is the tensile
strength of metals in a mechanical device after modification in the de-
sign, it is not error to exclude expert testimony to the effect that tests
disclosed that the tensile strength of the metals was insufficient for the
device to perform the function for which it was manufactured when it
does not appear whether the devices tested were manufactured before or
after the modification of the design.

### 3. Evidence § 16—

In order for experimental evidence to be competent, the circumstances
attendant the experiment must be substantially similar to those which
attended the actual occurrence; thus, where the crucial question is
whether the design or tensile strength of the metals in a mechanical de-
vice were sufficient to enable it to perform a particular function when
properly installed in certain types of automobiles, evidence of the failure
of the device when installed in a particular type of automobile is in-
competent in the absence of evidence of proper installation in a type of
automobile contemplated by the parties, etc.

### 4. Evidence § 48—

Metallurgical experts are competent to testify as to the tensile strength
of metals in a mechanical device as affected by its design when such
testimony is based upon facts observed by the witnesses in testing the
materials or upon proper questions based on hypothetical facts in evi-
dence.

### 5. Contracts § 29—

A party injured as a result of breach of contract is entitled to compen-
sation which will place him, insofar as can be done by money, in the
same position he would have occupied had the contract not been breached,
which compensation includes gains prevented as well as losses sustained,
provided they were within the contemplation of the parties at the time the
contract was executed.

### 6. Evidence § 51

A hypothetical question should ask the expert witness whether a par-
ticular condition could or might have produced the result in question and
not whether it did produce the result.

**7. Damages § 14—**

Plaintiff is not required to prove his damages with absolute certainty but is required to introduce evidence showing his damages with sufficient completeness and certainty to permit the jury to arrive at a reasonable conclusion.

**8. Sales § 10—**

If after partial delivery the purchaser wrongfully breaches its contract to buy a specified number of articles, the seller is entitled to recover as his damages the unpaid balance of the contract price for the units delivered, the loss of profits with respect to the undelivered portion of the order, measured by the difference between the contract price and the cost of manufacture, including cost of materials, direct cost of labor, overhead, and fixed charges incurred at the time of notification by the purchaser that it would not accept further shipments, and the cost of materials, less salvage, and of labor, overhead, and fixed charges wasted by reason of the breach.

**9. Guaranty—**

Where a third party, with the consent of the seller, assumes all liability of the original purchaser, and the original purchaser guarantees in writing to the seller the payment by such third party of the indebtedness, the original purchaser becomes a mere guarantor of payment.

**10. Same; Sales § 8—**

A guarantor of payment by the purchaser may not set up a counterclaim against the seller for breach of warranty and can realize no affirmative recovery thereon but, at most, may set up damages for breach of warranty as a setoff to be subtracted from the indebtedness of the principal for which the guarantor is liable.

APPEAL by defendants from *Walker, S.J.,* February 12, 1962, Special Civil "A" Term of MECKLENBURG.

Action for breach of a sales contract.

The complaint alleges in substance the following facts (numbering ours):

(1). All parties to this action are North Carolina corporations and their principal offices and places of business are in Mecklenburg. County.

(2). Defendant Radiator Specialty Company (Radiator) obtained from an Indiana corporation license to manufacture and sell a patented mechanical device, later called a Fan-O-Matic. (The device was for attachment to the water pump shaft of automobiles, and consisted of a drive plate and hub. A fan mounted on the hub was to replace the regular automobile fan. The device was so constructed that, when an automobile to which it was attached reached a given speed, the contrifugal force from the rotation of the water pump shaft would so

affect the mechanism as to release the fan and cause it to cease to rotate. The theory is that after automobiles attain a certain speed, 30 to 40 miles per hour, no fan is needed, and the release of the fan reduces engine noise and vibration and increases available horsepower, gas mileage and acceleration.)

(3) Radiator conferred with plaintiff in late 1955 and early 1956 and proposed that plaintiff manufacture the parts for Fan-O-Matic. Drawings of the inventor's model were presented to plaintiff and it was requested to quote a unit price for manufacture of the device. At the request of Radiator, plaintiff made drawings and designs and fabricated a model, for which Radiator paid plaintiff $1700.

(4). Revisions were made in the design and Radiator gave plaintiff authority by written purchase order to procure dies and molds for the manufacture of Fan-O-Matic parts. It was agreed that Radiator would pay $8750 for the dies and molds "upon approval by (Radiator) of sample units made from the dies and molds."

(5). On 13 June 1956 Radiator placed an order for parts for 10,000 units of Fan-O-Matic at $6.86 per unit, and plaintiff agreed to manufacture them at that price. Thereafter, defendant Product Development and Sales Company (Product Development) was organized and incorporated and with consent of plaintiff assumed all liability of Radiator for the purchase orders. Radiator guaranteed to plaintiff in writing the payment of the indebtedness which had been assumed by Product Development. On 4 February 1957 Product Development paid plaintiff $8750 for the dies and molds for the manufacture of the parts.

(6). Plaintiff purchased materials necessary to produce the parts for 10,000 units, manufactured 300 units and delivered them to defendants for testing and approval. Thereafter, defendants directed plaintiff to proceed with dispatch in manufacturing and delivering the remaining 9700 units. After plaintiff had made and delivered a considerable number of the parts for these units, Product Development in breach of the contract directed plaintiff to cease manufacturing the parts, declared the contract rescinded, and refused to make any further payments to plaintiff.

(7). Plaintiff is entitled to recover of defendants, for breach of the contract on the part of Product Development and upon Radiator's guarantee, the sum of $58,126.61.

Defendant Product Development, answering, denies that it breached the contract, and alleges by way of counterclaim the following ultimate facts (paragraphing ours):

(a). Plaintiff represented that it specialized in engineering, designing and manufacturing items composed of metal and metal parts, and

stated it could improve on the inventor's model. Plaintiff was paid $1700 for designing a new model and making a sample unit. Radiator completely relied on plaintiff's skill and judgment, and plaintiff was advised of the purpose of the item and that it was to be sold for use on automobiles.

(b). Radiator authorized plaintiff by purchase order to have dies and molds made for the manufacture of Fan-O-Matic at a cost of $8750, to be paid by Radiator upon its approval of sample units made from the dies and molds. And on 13 June 1956 Radiator ordered 10,000 units and obligated to pay $6.86 per unit. In connection with this order plaintiff made express warranties as follows: (1) Plaintiff "guarantees that the Fan-O-Matic unit will be functioning correctly in accordance with the data supplied by Radiator. . . ." (2) "All material and workmanship shall be guaranteed for a period of 18 months after shipment of first production lot."

(c). Fan-O-Matic was given nationwide advertising, and orders began to be received by Radiator. Product Development was organized and incorporated for the purpose of purchasing the Fan-O-Matic units from plaintiff. All the rights and liabilities of Radiator were assigned to Product Development with the approval of plaintiff; Radiator guaranteed to plaintiff the responsibility of Product Development for all purchases to be made from plaintiff. Product Development was to purchase the units from plaintiff and sell and deliver them to Radiator for resale to the trade. This plan was known to plaintiff.

(d). The first deliveries (300 units) were made by plaintiff in January 1957. As soon as these were put on the market complaints began to come in that "the units were flying apart and the bolt at the center bearing seat was breaking off." Defendants complained to plaintiff and changes were made, and plaintiff assured defendants that the units would cause no more trouble to users. Further deliveries were accepted. On 1 February 1957 Product Development, on the insistence of plaintiff, paid the $8750 account for dies and molds, but specified that the payment did not "constitute an acceptance or approval of the performance of the Fan-O-Matic unit."

(e). Product Development actually received 2,877 units, most of which were put in the channels of trade by Radiator. Again complaints began to come in that the units were flying apart in use and causing damage. Radiator recalled all shipments and 2,161 units were returned, many of them in broken condition. Radiator declined to accept any further deliveries, and Product Development notified plaintiff that

the order was rescinded and no further units were to be made or delivered.

(f).  There was a breach of plaintiff's express warranties, and also of the implied warranty that the units were fit for use for the purpose intended. Product Development is entitled to recover of plaintiff all sums paid and loss of profits, totalling $23,544.

Radiator, answering, denies that it is liable to plaintiff in any amount on account of the guarantee, states essentially the same facts alleged by Product Development in its answer, and asserts by way of counterclaim right to recover loss of profits and expenditures made by it in connection with the venture, totalling $53,707.92, on account of breach by plaintiff of express and implied warranties.

Evidence was offered by all the parties at the trial. The court submitted to the jury the following issues:

"1.  Did the defendant breach the contract with the plaintiff, as alleged in the Complaint?

"2.  If so, what amount, if any, is the plaintiff entitled to recover from the defendants?

"3.  Did the plaintiff breach the express warranties as alleged in the answers and counterclaims?

"4.  If so, in what amount, if any, is Product Development & Sales Co. entitled to recover from the plaintiff?

"5.  Did the plaintiff breach the implied warranty that the design was reasonably fit for the purpose for which they were sold and purchased, as alleged in the answers and counterclaims?

"6.  If so, in what amount, if any, is Radiator Specialty Company entitled to recover of the plaintiff?"

The jury answered the first issue "Yes," and the second issue $51,485.37." Thereupon the court entered judgment for plaintiff and against defendants, jointly and severally, in the sum of $51,485.37.

Defendants appealed.

*Pierce, Wardlow, Knox and Caudle, and Stuart R. Childs for plaintiff.*

*Weinstein, Waggoner & Sturges (formerly Weinstein, Muilenburg, Waggoner & Bledsoe) for defendants.*

Moore, J.   There are more than 200 pages of evidence in the record. A detailed review of the evidence is not essential for decision of the questions raised on this appeal. General summaries of the contentions

of the parties, which find support in their evidentiary offerings, will suffice.

Plaintiff's contentions: When requested by defendant to manufacture the Fan-O-Matic, plaintiff advised that it had had no experience in the automotive field. To make the type of instrument defendant wanted die casting was necessary, and this process of manufacture was outside plaintiff's usual field of operation. Plaintiff suggested two or three manufacturers defendant might deal with. Defendant stated it wanted plaintiff to do the job because plaintiff was located in Charlotte, there were problems to be "ironed out," plaintiff was close at hand and defendant could follow the work and help expedite it. In every step of planning and designing there were extended conferences and close cooperation between the engineers and executives of plaintiff and defendant. Defendant's approval was had with reference to each decision. Plaintiff first made studies and drawings for production of a satisfactory design and model, and to determine price. The first price plaintiff quoted was $15 per unit. Defendant insisted that to market the device the manufacturer's price had to be much lower. By revisal of manufacturing methods, choice of materials, and reduction of the scope of plaintiff's work and responsibilities the unit price was finally lowered to $6.86. Defendant agreed that plaintiff would not furnish the fan, defendant would gather the necessary information concerning clearance space in the makes of automobiles on which the Fan-O-Matics were to be used (this information was necessary for determination of the size of the instrument), defendant would be responsible for problems related to installation on customers' cars and would prepare installation instructions, and plaintiff would not assemble the units but would deliver sub-assemblies in bulk. It was agreed that the drive plate and attachments would be die castings of aluminum material, and the hub of cast iron. After many conferences and the incorporation of the suggestions of defendant's engineer and executives, dies and molds were procured. Ten soft die models were made for initial testing. After tests by plaintiff and defendant, the latter approved enthusiastically. It was then agreed that a lot of 300 units would be made and sold to the trade, which would provide a test throughout the country in actual use. In the meanwhile defendant had advertised the Fan-O-Matic on a nationwide scale, and orders had begun to come in. Defendant had made a test at the Indianapolis Speedway. The responsible executive of defendant told plaintiff: "Forget about testing. We have enough proof now. Our entire organization is satisfied with it. . . . I want Fan-O-Matic coming out of our ears." Defendant placed an order for 10,000 units (including the 300 test

units), to be delivered at the rate of 2000 per month. Plaintiff purchased materials necessary to supply the units and went into production. Shortly after the 300 units were put on the market a few broken units were returned. In collaboration with defendant's engineer several changes were made to avoid installation errors. There were complaints that the hub was pulling out in installation or breaking out in operation. Plaintiff suggested steel inserts to strengthen the instrument at the hub. Defendant's engineer insisted that the mere insertion of a washer would solve the difficulty, and this plan was adopted. Defendant had advertised that Fan-O-Matic was adaptable to all cars, including sport cars and racers, and the cut out speed was at 40 miles per hour. The instrument, in accordance with defendant's instructions, was designed to cut out at the speed of 30 to 35 miles per hour, to be operated on motors having a maximum of 4800 revolutions per minute, and to be used on such standard cars in the moderate price field as clearance dimensions would permit. Defendant had drawn up installation instructions without consultation with plaintiff, and to make it adaptable to a wider range of cars sent along washers and other adapters, of which plaintiff had no knowledge. According to plaintiff's tests the instrument operated perfectly when installed so as to be in balance, and when the fan used was staticly in balance and not too heavy. The failures of the instrument in use were due to faulty installation. About two months before defendant cancelled the order, defendant's engineer had begun work on another model. Defendant was making its own Fan-O-Matic and selling it within a few months after the contract with plaintiff was cancelled. Plaintiff's warranty was that the Fan-O-Matic would be manufactured "in accordance with the *approved design*" and would be functioning correctly "in accordance with the *data supplied by Radiator Specialty Company.*" Defendant had approved the design, and it was manufactured in accordance therewith. It did function in accordance with the data furnished by Radiator. The materials used had been approved by defendant. Plaintiff agreed and stood ready to replace any units in which there were faulty materials or workmanship. (There are two defendants, but for the sake of simplicity the singular "defendant" is used in this opinion except when the discussion requires differentiation.)

Defendants' contentions: Plaintiff represented that it could improve on the inventor's model and make practical adaptation to a wider range of cars. Plaintiff agreed to engineer and design the Fan-O-Matic. Plaintiff's engineer drew the plans "for a die cast drive plate and specifically determined the configuration, thickness and shape of the hub." Defendant questioned whether the proposed die cast drive plate

would be strong enough and stated that plaintiff would have to guarantee to defendant that it would be. Plaintiff assured defendant that it would be strong enough. Even so, defendant required plaintiff to make the following express warranties at the time the $8750 purchase order for dies and models was given: (a) Plaintiff "guarantees that the Fan-O-Matic unit will be manufactured in accordance with the approved design, and will be functioning correctly in accordance with the data supplied by Radiator. . . ."; and (b) all material and workmanship shall be guaranteed for a period of 18 months after shipment of first production lot." At all stages defendant relied on plaintiff in all matters of design. When the ten soft mold models had been made and were being tested defendant wrote plaintiff, "The metal thickness between the sharp corner at the bottom of the .750 dia. counterbore in the drive plate, and a corresponding dia. on the beveled hub outside the drive plate is only .115. Is this two weak for the work required of this part?" Plaintiff replied, "On the metal thickness of the aluminum drive casting, please note that the wall thickness is ⅛ inch, however, the ribs on the front side, in conjunction with the hub, make this a very strong cross-section." As soon as the first Fan-O-Matics were put on the market, defendant began to receive complaints from customers, some of whom returned the units. Many necessary changes were made. Because of the lack of sufficient tensile strength of the materials used and faulty design the Fan-O-Matic, even after corrections, continued to fly apart in use. After each effort to remedy defects plaintiff assured defendant that the unit was all right. Plaintiff delivered nearly 3000 units, and complaints kept coming in. The units were flying apart and damaging automobiles. They were dangerous to persons and property. The hub of the drive plate was improperly designed, it would not withstand the stresses exerted upon it. The units were not fit for the purpose intended. Defendant cancelled the order. "It was and is the crux of the position of the defendants that the sharp corners on the neck (hub) . . . of the drive plate coupled with the brittle qualities of the casting, constituted a serious defect that prevented the unit from functioning properly or safely."

(1). Plaintiff's engineers testified, without objection, that the breakage that appeared in the damaged units which were returned resulted from faulty installation. To counter this evidence defendants offered the testimony of experts, which was excluded. Defendants assign as error the exclusion of this testimony.

R. B. Lincoln, a professional engineer registered in the State of Pennsylvania, testified for defendant. He recounted at length his

training, experience and professional connections, including graduate study at Carnegie Institute of Technology and the University of Pittsburg, employment for 26 years by Pittsburg Testing Company, and membership in the American Society for Testing Materials. His main experience was in testing for metal failures, particularly failures of parts of automobiles.

Mr. Lincoln made five inspections and tests of Fan-O-Matic:

(1). He put a brake block from a Fan-O-Matic drive plate in a testing machine and measured the deflection of the spring with given static loads. The deflection is the movement of the spring away from the force applied on it. Each time a load was removed he made a reading of the permanent "set," that is, the deflection that remained after the load was taken off.

"Q. What were the results of your tests, Sir?

"Plaintiff objected — sustained."

The record does not disclose what his answer would have been.

(2). He mounted a Fan-O-Matic on a simulated automobile water pump shaft, which could be driven at adjustable speeds. It was mounted according to printed instructions accompanying the unit. A fan furnished by defendants was attached; it was an ordinary automobile fan with four blades. The fan was not checked for balance — the instructions did not require it. The speeds of the drive plate and fan were measured separately by strobotach. Speed was periodically increased "until failure occurred."

If the witness reached any conclusions from this test, he was not interrogated with respect thereto and expressed no opinion.

(3). On 26 February 1960 a Fan-O-Matic was installed on a 1955 Chevrolet Station Wagon by a mechanic, under the supervision and in the presence of Mr. Lincoln. No adapters were necessary, and there was sufficient clearance. The installation was in accordance with printed instructions. The fan on the car was used; it was not checked for static balance. The vehicle was driven on the highway by the mechanic; Mr. Lincoln was present and observed speeds. Speeds up to 100 miles per hour were attained. The vehicle was driven in second gear at a speed of 72 miles per hour. After the test was completed the Fan-O-Matic was dismounted and upon examination Mr. Lincoln found "the corners of two of these little brake blocks broken off." The witness was not asked for an opinion and gave none. The testimony with respect to this test was given in the absence of the jury. The court ruled that this testimony was incompetent.

(4). On 26 February 1960 another Fan-O-Matic was installed in accordance with printed instructions on the same automobile. A test was

made to determine the number of revolutions of the fan per minute in relation to the speed of the automobile. At a car speed of 100 miles per hour the fan would revolve 4400 times per minute. After this test the vehicle was driven a short distance. The unit failed when the car gears were shifted from low to second — the car speed was about 10 miles an hour. The hood was opened and it was found that the free wheeling hub had separated from the drive plate, the fan was lying against the lower water hose and was damaged, and the car radiator was damaged. Mr. Lincoln examined the broken unit.

"Q. Now, Mr. Lincoln, state whether or not you have an opinion as to what caused that unit to break?

"A. I do, yes, Sir.

"Q. . . . What is that opinion, Sir?

"A. Well, the combination of the two sharp corners, namely, the one at the outside of the boss supporting the freewheeling hub and the threads right at the end of the steel bolt or cap screw that holds that, in combination with the rather brittle properties of the die casting rendered it unable to stand the stresses it had countered in this drive."

"Q. If the jury should find by the greater weight of the evidence that this Fan-O-Matic unit was designed, or to be designed, for speeds of 4800 RPM, do you have an opinion satisfactory to yourself as to whether or not the design and configuration of this drive plate in the hub or boss area was adequate for such speeds?

"A. I do.

"Q. What is that opinion?

"A. It was not.

"Q. What is the basis of that opinion?

"A. A sharp corner should never be combined with a material that is not exceedingly ductal and subject to dynamic stresses."

The testimony with respect to this test was given in the absence of the jury. The court excluded the testimony.

(5). While Mr. Lincoln was on the witness stand he was asked to examine three or four broken units which had been identified by other witnesses. With reference to one of them he was asked: "Upon your examination of that unit, Mr. Lincoln, what, in your opinion, caused the unit to break?" Plaintiff's objection to the question was sustained. There was no answer.

Robert N. Hooker, who was found by the court to be an expert metallurgical engineer, testified for defendants. He has a degree in metallurgical engineering from Purdue University. He has for the past

11 years been in charge of materials, research and process section for Douglas Aircraft Company, and evaluates and assists in application of materials and processing both as engineer and production assistant. He had previously done laboratory work for Studebaker Motor Company evaluating incoming materials and inspecting type failures.

Mr. Hooker made a laboratory examination of the materials in a Fan-O-Matic. He cut the drive plate into pieces and retained a portion. The plate was sectioned through the center, and one-half of the center portion of the hub was cut out and put in a plastic mount for observation. He testified in substance: The drive plate is a die casting. In the process of manufacture porous areas are left inside the casting, and the quality of die castings vary to a limited extent due to porosity. There were in the hub three sharp corners, which are referred to as stress risers. When you impose a stress riser in, it actually amplifies the amount of stress in that part. Stress is transmitted from the fan through the bolt to the area where the threads and stress risers are. Mr. Hooker expressed the following opinions: The ultimate tensile strength or endurance strength of the metal in the drive plate is 45,000 p.s.i. The sharp corners (stress risers) reduce the normal tensile strength of the metal about one-half. The failures in the broken units (then in the courtroom) are all in the same area, and progress from one stress riser to another, and the failures were caused by stress imposed in the area of the stress risers in excess of the strength of that portion of the metal. Pulsating or fatigue type loading was a major factor in the failures. It is always good practice to eliminate stress risers. Die casting and sharp corners (stress risers) are a combination that should not go together. Revving of the motor causes stress; how fast an engine is capable of revving is more important than maximum RPM. Therefore, testing under service conditions is better than laboratory testing.

"Q. Now, Mr. Hooker, if the jury should find, and by the greater weight of the evidence, that one of these units was installed on a motor vehicle and that thereafter, after approximately one month had passed, and if a jury should find by the greater weight of the evidence that during that one month the unit functioned correctly, and if the jury should then find that the owner of the car pressed on the accelerator to rev up the motor, and if the jury should then find, by the greater weight of the evidence, that the unit, like the Exhibits U-2 or U-5, snapped off at the bottom of the hub, or the stud at a point running from one of the V-grooves where the hub screw screws down from that point, across to a sharp corner on the upper side of the hub, do you have an opinion satisfactory to yourself as to the cause of that failure?

"A.  Yes.

"Q.  What is that opinion?

"A.  I would attribute this to fatigue and it could be caused by more than one item here. It could be the fact that you have three risers here. These can be amplified or decreased by the machining that took place, if you happen to get exceptionally sharp radiuses in one place it would be amplified in all the others; also a possibility these castings are not completely uniform. By chance you could get one where defects might appear, line up in an area where maximum stress is being applied by all of them. I would attribute your evaluation of the stresses and stress risers would be such as to exceed strength of material and get failure.

"Q.  Referring to the hypothetical question I just proposed to you, is it your opinion that the failures, under those circumstances, was caused by the sharp corners at the base of the hub in the drive plate, coupled with the fact the drive plate was made out of a die casting?

"A.  I would say yes."

A portion of the testimony by Mr. Hooker was taken in the absence of the jury. The court ruled that it was incompetent.

From the record in this case we are unable to say that the court erred in excluding the opinion evidence of Mr. Lincoln and Mr. Hooker. With reference to tests and inspections 1, 2, 3 and 5 made by Mr. Lincoln, the record does not disclose what his opinions, if any, were. "The exclusion of testimony cannot be held prejudicial when the record fails to show what the answer of the witness would have been had he been permitted to testify." 1 Strong: N. C. Index, Appeal and Error, s. 41, p. 121 (and Supp. p. 42), and cases there cited. With reference to Test 4 by Mr. Lincoln and the testimony of Mr. Hooker, the data was inadequate for opinion purposes. For instance, we are unable to ascertain from the record whether the Fan-O-Matics tested by them were from the lot of 10 soft die test models first made by plaintiff, from the lot of 300 test units, or from the final deliveries after corrections had been attempted. A most careful examination of the record does not disclose to us this vital information. If the opinion of an expert witness "is based on obviously inadequate data, the trial judge may properly refuse to allow it to go to the jury." Stansbury: North Carolina Evidence, s. 136, p. 270. The judge's ruling might also be sustained on other grounds which will be adverted to in our discussion below. Since there must be a new trial, because of error in another feature of the case, we think it appropriate to outline briefly pertinent principles relating to expert testimony.

Evidence of the Fan-O-Matic tests made by Mr. Lincoln in service on the highway was offered on the theory, in part as least, that these tests were experiments. Where the tensile strength of materials is an issue, evidence may be received as to tests of tensile strength of materials that are the same as, or are substantially similar to, those whose tensile strength is in controversy. 20 Am. Jur., Evidence, s. 759, p. 631; *State v. Commercial Casualty Ins. Co.*, 248 N.W. 807, 88 A.L.R. 790 (Neb. 1933). However, the circumstances of the instant case do not readily lend themselves to *in service* experiments (as the term "experiment" is ordinarily understood in the law of evidence) for proof of the tensile strength of the materials of the Fan-O-Matic drive plate. Plaintiff assumed certain responsibilities with respect to the instrument, and defendant assumed others. Plaintiff guaranteed that Fan-O-Matic would be manufactured in accordance with the *approved design* and would function correctly in accordance *with data supplied by defendant,* guaranteed all material and workmanship for a period of 18 months, and agreed to repair or replace all defective parts. Defendant assumed responsibility for installation, installation instructions, the fan, and the selection of the types of automobiles on which it was to be used. Plaintiff was not to be responsible for liability caused by installation, tempering, negligence or misuse. To be competent as in service experiments the tests by Mr. Lincoln must have been such as to demonstrate that failures did not result from neglect of defendant to meet its responsibilities, that tempering, negligence and misuse played no part, and that failures arose from faulty design or the lack of tensile strength of materials. The in service tests failed to demonstrate this with sufficient clarity. There is no showing that the Fan-O-Matic was designed for use on a station wagon, that the station wagon was standard and in good condition, that the installation (though in accordance with instructions promulgated by defendant) was in keeping with good engineering practice, or that the fan was substantially in good static balance and of proper size and weight. Moreover, it is debatable whether a test at 72 miles per hour in second gear is not a misuse of the instrument.

In the law of evidence an experiment ordinarily involves the re-enactment of an occurrence under circumstances substantially similar to those which attended the actual occurrence, and for the experiment to be competent those attending circumstances must be understood and simulated with reasonable certainty, and the experiment must tend to produce the same result as the occurrence and to demonstrate that the occurrence resulted from the cause or causes in issue. The experiment should speak for itself and be complete within itself.

"To be admissible in evidence, an experiment must satisfy this two-fold requirement: (1) The experiment must be under conditions substantially similar to those prevailing at the time of the occurrence involved in the action; and (2) the result of the experiment must have a legitimate tendency to prove or disprove an issue arising out of such occurrence." *Mintz v. R.R.*, 236 N.C. 109, 72 S.E. 2d 38. Mr. Lincoln did not purport to re-enact a prior definite occurrence, making the circumstances of his in service tests conform thereto. The court did not abuse its discretion in excluding the testimony as an experiment. "The rule obtains in this jurisdiction that 'whether or not evidence of experiments is admissible is, under the circumstances of each case, a preliminary question for the determination of the court in the exercise of its discretion, which will not be interfered with by an appellate tribunal unless an abuse is made clearly to appear.' 32 C.J.S., Evidence, s. 687. . . ." *Mintz v. R.R., supra.* See also: 76 A.L.R. 2d Anno: Evidence — Experiments — Admissibility, pp. 372, 376; 8 A.L.R., Anno. — Experimental Evidence, p. 18, supplemented by 85 A.L.R. 479; 9 N.C.L. Rev. 453. However, it should be borne in mind that a party has the right to present evidence of similarity of conditions attending the experiment with those attending at the time and place of the accident, as the basis of presenting evidence as to the results of such experiment. The exercise of this right is not a matter of judicial discretion. *Tuite v. Union Pacific Stages, Inc.*, 284 P. 2d 333, 345 (Ore. 1955).

In our opinion Mr. Lincoln and Mr. Hooker did not make the inspections and tests, described by them, as experiments in the legal sense. They were experiments in the scientific sense, it is true. They each made a series of inspections and tests to enable them, from the information thus obtained and from their knowledge as engineers and metallurgical experts, to express opinions as to the tensile strength, affected by the design, of the Fan-O-Matic drive plate and hub. The rule is that an expert "must base his opinion upon facts within his own knowledge, or upon the hypothesis of the finding by the jury of certain facts recited in the question." *Summerlin v. R.R.*, 133 N.C. 550, 555, 45 S.E. 898; *Yates v. Chair Co.*, 211 N.C. 200, 202, 189 S.E. 500. "Opinion testimony of experts is only admissible in cases of necessity, where the proper understanding of facts in issue requires some explanation of those facts or some deduction therefrom by persons who have scientific or specialized knowledge or experience. Such testimony does, in a broad sense, encroach upon the province of the jury; and when it relates to matters directly in issue, it should not be admitted unless its admission is demanded by the necessities of the individual case." 20 Am. Jur., Evidence, s. 782, p. 653; *Patrick v. Tread-*

*well,* 222 N.C. 1, 5, 21 S.E. 2d 818. The facts upon which an expert grounds his opinion "must be brought before the jury in accordance with the recognized rules of evidence. When these facts are all within the expert's own knowledge, he may relate them himself and then give his opinion; or, within the discretion of the trial judge, he may give his opinion first and leave the facts to be brought out on cross examination." Stansbury: North Carolina evidence, s. 136, p. 268. When the facts upon which an expert bases his opinion are within his own knowledge he "will be permitted to testify directly as to what in his opinion caused a particular occurrence or condition, and is not restricted, as in case of answers to hypothetical questions, to stating what might or could have caused it." *ibid,* pp. 269, 270. "The opinion of an expert may be introduced as to the cause of a break or other sign of damage in an object, appliance or apparatus affected by an accident or occurrence, formed upon his examination of it and offered as evidence of the cause of the event." 38 A.L.R. 2d, Anno: Opinion Evidence — Cause of Accident, p. 39.

We have already noted that the court properly excluded the opinion evidence in this case because it was based on inadequate data. Had the data been adequate, we can conceive of no reason why this evidence would not have been competent. *Keith v. Gregg,* 210 N.C. 802, 188 S.E. 849; *Tire Setter Co. v. Whitehurst,* 148 N.C. 446, 62 S.E. 523. The hypothetical questions addressed to the expert witnesses were faulty in form. The witnesses were asked whether a particular condition *did* produce the result. The inquiry should have been whether the condition *could* or *might* have produced the result. Stansbury: North Carolina Evidence, s. 137, p. 272.

(2). In our opinion errors affecting the second issue, relating to plaintiff's alleged damages, compel a new trial.

Mr. William W. Bowers, plaintiff's accountant, gave testimony to serve as a basis for determining these damages. Much of this testimony was received in evidence over the objection of defendants. The witness stated in substance: At the time the purchase order for the 10,000 Fan-O-Matics was cancelled, plaintiff had manufactured and delivered 3111 units. Product Development had been billed for these at $6.86 per unit, and had made payments on account. 230 units had been returned and Product Development had been given credit for them. There was a balance of $11,823.51 due plaintiff on account of the delivered units. Plaintiff had expended for the materials necessary for the manufacture of the 10,000 units the sum of $25,028.87. The cost of direct labor for work done on the order was $7,995.15. The factory overhead (including salaries for shipping and receiving clerks, fore-

men and superintendents, the cost of insurance, perishable tools, power, light, gas, supplies, etc.) was $14,791.03, which is 185% of direct labor cost. Administrative and selling expenses (including salaries of officers, clerks and stenographers, and cost of stationary and supplies, etc.) amount to $11,581.38, which is 23.78% (13.72% for selling, plus 10.06% for administrative expense) of the unbilled portion of the purchase order. And profits prevented amounts to $4,427.48.

The only principle of law stated by the trial judge in the charge for the guidance of the jury in determining damages is the following: "The damages to which one party to a contract is entitled because of a breach thereof, by the other, are such as arise naturally from the breach thereof, or such as may be reasonably supposed to have been within the contemplation of the parties at the time of making the contract as a probable result of the breach. Conversely, damages which do not arise naturally from a breach of the contract, or which are not within the reasonable contemplation of the parties, are not recoverable." After the court had delivered the charge the jury made at least three requests for a "financial breakdown" and directions for determining damages. In response, the court did nothing more than recapitulate the evidence. The jury was left without legal guidance to assess damages from testimony utterly inadequate in form and content for a proper determination.

For a breach of contract the injured party is entitled as compensation therefor to be placed, insofar as this can be done by money, in the same position he would have occupied if the contract had been performed. The amount that would have been received if the contract had been kept and which will completely indemnify the injured party is the true measure of damages for the breach. Where one violates his contract he is liable for such damages, including *gains prevented* as well as *losses sustained,* which may fairly be supposed to have entered into the contemplation of the parties when they made the contract. *Tillis v. Cotton Mills,* 251 N.C. 359, 111 S.E. 2d 606; *Chesson v. Container Co.,* 215 N.C. 112, 1 S.E. 2d 357.

By "gains prevented" is meant loss of profits, if any would have been realized from the completed transaction. In determining loss of profit, the following rules are applicable in appropriate circumstances: The measure of damages for the buyer's breach of a contract for the manufacture of goods, where the goods have already been manufactured or produced and where there is an available market therefor, is the difference between the contract price and the market price at the time fixed for delivery. However, if the goods are manufactured for a particular purpose, or for other reasons have no general market

value, the rule of damages based on the difference between the contract price and the market price does not apply. In such case, the measure of damages has been generally stated to be the difference between the contract price and the cost of manufacture. If at the time of the breach a part of the goods has been manufactured and delivered, the seller may recover as damages the full contract price (less any credits) for the goods delivered and, as to the portion of the goods not delivered, may recover the difference in the contract price of the undelivered goods and what it would have cost the seller to manufacture and deliver the undelivered portion. *Springs Co. v. Buggy Co.,* 148 N.C. 533, 62 S.E. 637; *Clements v. State,* 77 N.C. 142; 78 C.J.S., Sales, s. 479(c), pp. 145-6; 44 A.L.R., Anno: Damages — Sales — Buyer's Breach, p. 215, supplemented in 108 A.L.R. 1482; 3 Williston, Sales (Rev. Ed. 1948) s. 583a, p. 246.

"In addition to lost profits, the seller may recover expenditures for labor and materials reasonably made in part performance of the contract, to the extent that they are wasted when performance is abandoned." 78 C.J.S., Sales, s. 479(d), p. 147; *Leiberman v. Templar Motor Co.,* 140 N.E. 222, 29 A.L.R. 1089 (N.Y. 1923). In this category of damages "any expenses which might be reasonably contemplated by the buyer as the probable result of his failure to comply with the contract are properly included." (78 C.J.S., Sales, s. 482, p. 150) — provided, of course, they are wasted expenses, expenses attributable to undelivered goods. But recovery of damages and expenses referred to in the two preceding sentences are limited to such as accrued prior to notification by the buyer that he would accept no further deliveries. *Advertising Co. v. Warehouse Co.,* 186 N.C. 197, 119 S.E. 196. In determining damages for wasted materials, the market or salvage value of unused materials is to be deducted from the cost of the unused materials. The seller must use reasonable diligence to minimize damages. 78 C.J.S., Sales, s. 479(d), pp. 146-7; *Bennett v. S. Blumenthal & Co., Inc.,* 155 A. 68 (Conn. 1931); *Atalah v. Wilson Lewith Machinery Corp.,* 200 F. 2d 297 (4th Cir. 1952).

There is also the question whether, in determining lost profits by ascertaining the difference between the contract price of the undelivered goods and what it would have cost to manufacture and deliver these goods, the cost should include overhead expenses and fixed charges reasonably applicable to the undelivered portion of the contract. In cases, such as the one at bar, where the seller has an established and going business and is manufacturing and selling goods to various buyers, overhead and fixed charges constitute elements of cost of manufacture and are the subject of proper inquiry, and they

are susceptible of approximate ascertainment. *Worrell & Williams v. Kinnear Mfg. Co.*, 49 S.E. 988 (Va. 1905). It follows, in such case, that overhead and fixed charges are elements of damages for wasted labor and expenses, insofar as they are reasonably applicable thereto. In passing, it should be noted that in cases where the contract requires the seller to build a factory or expend large sums in particular preparation to supply the particular buyer for a long period of time, the cost of production is computed without including therein any allowance for overhead or fixed charges. *Georgia Power & Light Co. v. Fruit Growers Express Co.*, 190 S.E. 669 (Ga. 1937).

Plaintiff's evidence of damages must be certain, and sufficient in form and content to enable the jury to make the determination in accordance with the applicable legal rules. "Absolute certainty is not required but evidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion." *Tillis v. Cotton Mills, supra.*

Applying the foregoing rules, plaintiff may, if Product Development has breached the contract, recover of defendants as damages: (a) The unpaid balance of the contract price for the units manufactured and delivered; (b) lost profits with respect to the undelivered portion of the purchase order, that is, the difference between the contract price of the undelivered units and what it would have cost to manufacture and deliver them. The cost of manufacture is to include the cost of materials necessary to manufacture the undelivered units, the cost of direct labor thereon, and overhead and fixed charges. Overhead, of course, includes such items as factory overhead, administrative costs and selling costs. (c) Cost of materials, labor, overhead and fixed charges wasted by reason of the breach, but only such as accrued prior to the notification to cease deliveries. The amount of damages for materials wasted is to be determined by the difference between the cost of the materials on hand at the time of notification and the market or salvage value of such materials.

(3). Radiator counterclaimed directly against plaintiff for $53,707 .92 damages for alleged breach of express and implied warranties of merchantability on the part of plaintiff. The court permitted Radiator to introduce evidence to show that it had paid plaintiff $1700 for drawings and a model unit, but excluded all other evidence of damages in support of Radiator's counterclaim. Radiator contends that the exclusion of the evidence was error.

This raises the question whether Radiator may maintain a counterclaim against plaintiff for breach of such warranties. The answer is no.

Neither the evidence nor the facts pleaded permit an inference that there was any express warranty running from plaintiff to Radiator. Plaintiff sues Product Development on its purchase orders, and Radiator on it guaranty of Product Development's obligation. *Milling Co. v. Wallace*, 242 N.C. 686, 89 S.E. 2d 413. At the insistence of Radiator, plaintiff had agreed to permit Product Development to assume all liability for purchase orders and dealings with plaintiff, and to relieve Radiator thereof, and Radiator agreed to guarantee the payment of Product Development's obligation to plaintiff. This, by solemn agreement of the parties, created the relationship of buyer and seller between Product Development and plaintiff, and of guarantor and creditor between Radiator and plaintiff. A contract of guaranty creates secondary liability. Guaranty requires two contracts, one binding the principal debtor, the other engaging the responsibility of the guarantor. 24 Am. Jur., Guaranty, s. 11, pp. 879, 880. It is true that in an action by a creditor against the principal debtor and guarantor jointly, a claim existing in favor of the principal debtor may be set off by the guarantor against the demand of the creditor, unless the claim constiutes an independent cause of action in favor of the principal debtor. 38 C.J.S., Guaranty, s. 89, pp. 1261-2. There is authority to the effect that a warranty does not inure to the guarantor. *Fulton Bank v. Mathers*, 166 N.W. 1050 (Iowa 1918). But assuming that it does in the instant case, Radiator may insist on it only by way of setoff, and in so doing must stand in the shoes of Product Development, and can realize no affirmative recovery against plaintiff. Product Development is fully asserting its counterclaim for breach of warranty, and, if successful, Radiator is benefitted thereby.

Moreover, Radiator may not maintain its counterclaim on the theory of a breach of implied warranty. Radiator purchased Fan-O-Matics from Product Development, not from plaintiff. Radiator does not contend otherwise. It is the general rule that the benefit of a warranty in the sale of personalty does not run with the chattel on its resale and does not inure to the benefit of a subsequent purchaser of the chattel so as to give him any right of action on the warranty as against the original seller. 46 Am. Jur., Sales, s. 307, p. 489. Our decisions are in accord. *Prince v. Smith*, 254 N.C. 768, 119 S.E. 2d 923; *Wyatt v. Equipment Co.*, 253 N.C. 355, 117 S.E. 2d 21; *Simpson v. Oil Co.*, 217 N.C. 542, 8 S.E. 2d 813; *Rabb v. Covington*, 215 N.C. 572, 2 S.E. 2d 705; *Daniels v. Swift & Co.*, 209 N.C. 567, 183 S.E. 748; *Thomason v. Ballard & Ballard Co.*, 208 N.C. 1, 179 S.E. 30. A majority of the jurisdictions, including North Carolina, require privity between the parties for a recovery for a seller's breach of warranty. This rests on

the ground that the warranty is contractual in nature; therefore any party to an action for its breach must also have been a party to the sales contract. *Prince v. Smith, supra; Wyatt v. Equipment Co., supra.;* 1 Williston: Sales (Rev. Ed. 1948), s. 244, p. 645; 75 A.L.R. 2d, Anno: Products Liability — Privity, p. 39; 30 N.C.L. Rev. 191. Ordinarily the resale purchaser may sue the seller from whom he bought for breach of warranty, and the seller may bring in the manufacturer or wholesaler with whom he dealt, on the theory that the latter is primarily liable. *Davis v. Radford,* 233 N.C. 283, 63 S.E. 2d 822; *Williams v. Chevrolet Co.,* 209 N.C. 29, 182 S.E. 719. But Radiator seeks no recovery in this action against Product Development.

It is not clear upon what theory Radiator was allowed to introduce evidence of its $1700 payment to plaintiff for drawings and a model unit. This evidence is not competent upon any theory of breach of warranty, and there is no suggestion that the drawings and model unit were not satisfactorily made.

For the reasons stated, there will be a

New trial.