CARRIE WORLEY, RESPONDENT, v. PROCTOR & GAMBLE MANUFACTURING COMPANY, A CORPORATION, APPELLANT—253 S. W. (2d) 532.

St. Louis Court of Appeals. Opinion filed December 16, 1952.

Respondent's motion for rehearing, or, in the alternative, to transfer to the Supreme Court overruled, January 16, 1953.

*Dearing & Matthes, M. C. Matthes* and *Joseph G. Stewart* for Appellant.

Samuel Richeson. Richeson & Carr for Respondent.

ANDERSON, J.—This is an action to recover damages for personal injury brought by Carrie Worley, as plaintiff, against defendant, Proctor and Gamble Manufacturing Company, a corporation. The trial resulted in a verdict and judgment in favor of plaintiff in the sum of $500. Defendant has appealed from said judgment.

Plaintiff and her husband, Richard Worley, were proprietors of a restaurant in Potosi, Missouri, known as "Dick and Carrie's". Plaintiff worked in said restaurant, her duties consisted of waiting upon customers, preparing and cooking food, mopping the floor, and washing dishes. In washing dishes plaintiff used a washing powder known as "Tide", manufactured by the defendant and purchased from local retail merchants for use in the restaurant. After using this preparation for quite some time plaintiff experienced a breaking out on her hands which spread to her arms, causing her to be disabled. The object of the suit was to recover damages on account of this disability.

The petition counted on a breach of warranty, alleging that "the said preparation was manufactured by the defendant for use in washing dishes, and was sold by said defendant and warranted by it to be fit and safe for use for such purpose. It was further alleged that the said preparation contained an ingredient which rendered said "Tide" unfit and unsafe for use for dishwashing purposes. The petition further alleged that plaintiff, not knowing of the presence of said ingredient in the said preparation, proceeded to use said preparation in washing dishes, and that as a direct result of such

use a violent rash broke out over plaintiff's entire body which continued from February 1, 1950, for a period of more than two months, rendering plaintiff sick and causing her to suffer intense pain and to lose her earnings for a long period of time. The prayer of the petition was for damages in the sum of $3,000. The defendant's answer, after admitting that plaintiff was a resident of Washington County, and that the cause of action accrued in said county, denied all other allegations of the petition.

Plaintiff testified that she and Mrs. Florence King did most of the dishwashing in the restaurant, and that during February, 1950, Tide was used. The Tide used was purchased from either a retail dealer named Pleezing, or from Schramm Grocery Company, in Flat River. It was delivered to the restaurant in case lots. Each case contained either twenty-four or forty-eight packages. The cases were made of cardboard sealed with glue. About the first of February, 1950, a case was received at the restaurant. It was sealed when received and did not show any evidence of having been tampered with or opened. The boxes within the case were all sealed. None had been opened.

On the outside of each box of Tide appeared considerable printed matter extolling the virtues of Tide, referring to it as the "new washing miracle" and, in connection with dishwashing, after setting forth its superior qualities, the following representation appears: "And, of course, Tide is kind to hands, too."

Through answers to interrogatories addressed to the defendant, it was established that "Tide contains the synthetic detergents—sodium alkyl sulfate and sodium alkyl benzene sulfonate—and builders— sodium phosphate and sodium silicate. It also contains a small amount of moisture, some neutral sodium sulfate, and traces of perfume and minor ingredients."

In January, 1950, or the latter part of December, 1949, plaintiff experienced an itching on the back of her hands, then a breaking out which spread up to her shoulder on the inside of both arms. It extended to no other portion of her body.

Plaintiff further testified that she may have been using Tide, both in the restaurant and at home, for some six months before the breaking out on her hands occurred. While working in the restaurant her hands were quite often in dishwater containing Tide. When asked, how often, plaintiff replied: "It was just according to how heavy our business was. We did not have any certain time to start washing dishes. We kept our dishes washed up. If there was just two chili bowls or so on, we would wash them right then. * * * I just couldn't tell you for sure, but just any time we had dirty dishes or cleaning to do, we had our hands in it continuously. * * Sometimes I would say every five minutes we would have our hands in Tide water." It further appears from plaintiff's testimony that Tide had

been used with that frequency from three to six months before she noticed the skin eruption. The dishes and the counter rags were washed in the same water. Plaintiff also used a bleach and disinfectant, Purex, in the rinse water. After the dishes were washed in the Tide water they would be rinsed in a basin of Purex water. Plaintiff had used Purex for five years. In the course of her work plaintiff's hands came in contact with various kinds of foods, and meats, including beef, pork, and hamburger.

Plaintiff continued using Tide until the latter part of March when she consulted Dr. Conrad, a skin specialist in St. Louis. Dr. Conrad prescribed ointments, salve and a lotion for her hands and arms. Plaintiff wore bandages on her arms. After consulting Dr. Conrad plaintiff discontinued using Tide. Plaintiff testified that she quit going to Dr. Conrad in April, 1950. She stated: "I got a supply of his ointment and salve and used that up until—well, sometime up in the summer. It completely healed and once in a while it will break out and itch, and I would use more of the salve and drive it away." Plaintiff stated that the last time she noticed any breaking out and itching was the latter part of 1950. She testified:

"Q. In April, 1950, it cleared up? A. Yes, not completely, but enough I didn't want to spend any more money going to the specialist. * * * I continued on the job there, but shouldn't have."

Mrs. Florence King, who also worked in the restaurant and who did the same kind of work as that done by plaintiff, testified that about a week after she noticed the rash on plaintiff's hands and arms, a similar rash appeared on her own hands, which rash was still present at the time of the trial.

Joel Russell, Lytle Paul, and Fred Harris testified that they were in the Worley restaurant during the early part of 1950 and observed sores on the back of plaintiff's hands. Jack Long testified he ate at the restaurant three or four times a week. He saw sores on Mrs. King's hands, but did not observe any on Mrs. Worley's hands.

Plaintiff's evidence as to the condition of her hands and arms was corroborated by the testimony of her husband.

Dr. G. F. Cresswell testified that he treated Mrs. Worley during February and March, 1950. He stated that she had a rash on her hands and arms, "a red, raised rash, irregular spots, some of them large, some of them were small, mostly on the back of her hands and arms." He stated that he did not remember if there was "oozing" from the rash, but suspected that there was. He testified that he treated plaintiff about a week or ten days, or perhaps two weeks. In answer to a hypothetical question, the doctor stated:

"A. When I saw her—I saw her after I did Mrs. King—in my opinion, the rash was caused by the washing powder, the detergent, they were using and I so told them that it was, that it was

my opinion that it was, and recommended discontinuing the use of it.''

Appellant assigns as error the refusal of the trial court to direct a verdict in its favor for the reason that plaintiff failed to allege and prove facts showing privity of contract between the parties.

Where a consumer elects to sue for a breach of warranty the great majority of courts have held that there is no cause of action if the parties are not in privity. 1 Williston, Sales, (3rd Ed.), sec. 244; Finks v. Viking Refrigerators, 235 Mo. App. 679, 147 S. W. 2d 124; Pearl v. William Filene's Sons Co., 317 Mass. 529, 58 N.E.2d 825; Poplar v. Hochschild, Kohn & Co., 180 Md. 389, 24 A.2d 783; Turner v. Edison Storage Battery Co., 248 N.Y. 73, 161 N.E. 423; Degouveia v. H. D. Lee Mercantile Co., 231 Mo. App. 447, 100 S.W.2d 336. There are exceptions to this rule. These exceptions exist in the case of foods, beverages, and drugs. Taking into consideration the nature of the product, its mode of sale, and the probable harm resulting from latent defects, most courts have imposed absolute liability on the manufacturer for damages for injuries resulting from the use of such defective articles. Madouros v. Kansas City Coca-Cola Bottling Co., 230 Mo. App. 275, 90 S.W.2d 445; Beyer v. Coca-Cola Bottling Co. of St. Louis, Mo. App., 75 S.W.2d 642; McNicholas v. Continental Baking Co., Mo App., 112 S.W.2d 849; Carter v. St. Louis Dairy Co., Mo. App., 139 S.W.2d 1025; Foley v. Coca-Cola Bottling Co. of St. Louis, Mo. App., 215 S.W.2d 314; Helms v. General Baking Co., Mo. App., 164 S.W.2d 150; Klein v. Duchess Sandwich Co., 93 P.2d 799; Hertzler v. Manshum, 228 Mich. 416, 200 N.W. 155; Ward Baking Co. v. Trizzino, 27 Ohio App. 475, 161 N.E. 557; Davis v. Van Camp Packing Co., 189 Iowa 775, 176 N.W. 382; Mazetti v. Armour & Co., 75 Wash. 622, 135 P. 633; Tomlinson v. Armour & Co., 75 N.J.L. 748, 70 A. 314. The exception has also been extended to the purchase of other articles likely to produce physical injury if improperly manufactured or which contain elements injurious to health. Baxter v. Ford Motor Co., 168 Wash. 456, 12 P.2d 409; Simpson v. American Oil Co., 217 N.C. 542, 8 S.E.2d 813; Dow Drug Co. v. Nieman et al., 57 Ohio App. 190, 13 N.E.2d 130.

There have been various theories advanced by the courts in an attempt to either meet or rationalize away the common law requirement of privity considered necessary to an action based upon the contract. One such theory is to treat the act of the manufacturer in placing the goods upon the market, accompanied by the usual advertising found on labels, as an offer by the manufacturers which is accepted by the subvendee upon making a purchase. For a full discussion of the possibilities in this regard see notes in 9 Cornell Law Quarterly 487, and 16 Cornell Law Quarterly 610, 615. This theory is subject to the objection that no intention to contract by either party is present.

Some courts have accomplished the result by holding that the warranty of fitness for human consumption runs with the article like a covenant running with the land. Coca-Cola Bottling Works v. Lyons, 145 Miss. 876, 111 So. 305; Curtiss Candy Co. v. Johnson, 163 Miss. 426, 141 So. 762. Other courts have rendered the privity requirement innocuous by finding a third party beneficiary contract, see Ward Baking Co. v. Trizzino, 27 Ohio App. 475, 161 N.E. 557; while still others have placed their decision on the ground that public policy requires that the manufacturer be held liable on a warranty made directly to the consumer. Davis v. Van Camp Packing Co., 189 Iowa 775, 176 N.W. 382; Hertzler v. Manshum, 228 Mich. 416, 200 N.W. 155; Catani v. Swift & Co., 251 Pa. 52, 95.A. 931; Nock v. Coca-Cola Bottling Works, 102 Pa. Superior Court 515, 156 A. 537; Klein v. Duchess Sandwich Co. (Cal.) 93 P. 2d 709; Mazetti v. Armour & Co., 75 Wash. 622, 135 P. 633.

This latter theory is founded upon a belief that a warranty, for historical reasons, need not be based upon contract, and a conviction that modern marketing methods demand the elimination of the requirement of privity as a condition to recovery in a suit against a manufacturer by a subvendee.

Originally, sounding in tort, warranty was regarded in the nature of an action on the case for deceit. Ames, The History of Assumpsit, 2 Harv. L.Rev. 1; 1 Street, Foundations of Legal Liability (1906) 377; Holdsworth, A History of English Law (1905), Vol. III, p. 329. It was not until the middle of the eighteenth century that assumpsit was employed, and the first reported case seems to be Stuart v. Wilkins, 1 Douglas 18, 99 Eng. Rep. 15 (decided in 1778). See also, opinion of Lord Ellenborough in Williamson v. Allison, 2 East 446, 102 Eng. Rep. 439, wherein it is stated that the reason assumpsit became the more popular remedy was because "it was found more convenient to declare in assumpsit for the sake of adding the money counts." Privity thereafter was deemed necessary to the action. Several reasons have been suggested for the adoption of the privity requirement, namely: (1) privity actually existed in the early warranty cases; (2) the use of assumpsit may have led courts to regard warranty as strictly a contractual obligation; and (3) the deliberate adoption of the requirement of privity as a matter of policy to protect a manufacturer against liability to unknown persons. See comment, 7 Wash. L. Rev. 351; 21 Minn. Law Rev. 315. But, whatever may have been the justification for the adoption of the requirement in question, there is no good reason why the courts cannot re-examine the nature of a warranty and determine whether in all cases a relationship of sale or contract is a prerequisite to its existence and, in the interest of social justice, reshape the law to conform to the requirements of modern economic life.

The necessities of logic do not require that we disregard legal history, which refutes the oft repeated statement that a warranty is necessarily a contractual obligation, and follow decisions which have imposed arbitrary limitations resting upon convenience, or consideration of policy not applicable at the present time.

Under modern conditions of retail merchandising, and the employment of widespread advertising, representations are, in fact, made to the consuming public. Thus, the legend "Tide is kind to your hands" is not directed to the retail dealer—a mere conduit through which goods are distributed to the consuming public—but to the housewife, who is always solicitous of the condition of her hands. In such a situation, it would be in keeping with the realities of modern economic life to recognize the applicability of the principles of warranty as governing in a contest between the ultimate consumer and the party making such representations.

This is the view apparently recommended by Professor Williston in his work on sales. 1 Williston, Sales (3rd Ed.), p. 648, sec. 244a. The author says:

"If it be granted that a subpurchaser as such is not entitled to the benefit of a warranty given to the original buyer, it yet may be asked may not the original seller by means of labels, advertisements or otherwise bind himself by a warranty to anyone who thereafter buys his goods. Certainly manufacturers often make representations to the public, which if made directly to an immediate buyer would amount to warranties. The difficulty which most courts seem to feel in allowing the subpurchaser a remedy is based on the assumption that the liability of a warrantor is contractual, and, therefore, can only run directly between a purchaser and his immediate seller. This argument does not seem impressive as an original question. A warranty is in many cases imposed by law not in accordance with the intention of the parties; and in its origin was enforced in an action sounding in tort, based on the plaintiff's reliance on deceitful appearances or representations, rather than on a promise, and where forms of action are still differentiated, an action of tort is generally allowed even at the present day. * * *"

In our opinion, the administration of justice should not be restricted by a label attached to the remedy. We should look beyond the procedural forms to see the real nature of the wrong.

In the case of food products sold in original packages, and other articles dangerous to life, if defective, the manufacturer, who alone is in a position to inspect and control their preparation, should be held as a warrantor, whether he purveys his product by his own hand, or through a network of independent distributing agencies. In either case, the essence of the situation is the same—the placing of goods in the channels of trade, representations directed to the ultimate con-

sumer, and damaging reliance by the latter on those representations. Such. representations, being inducements to the buyers making the purchase, should be regarded as warranties imposed by law, independent of the vendors' contractual intentions. The liability thus imposed springs from representations directed to the ultimate consumer, and not from the breach of any contractual undertaking on the part of the vendor. This is in accord with the original theory of the action. 1 Williston, Sales, sec. 244a; notes and comments, 29 B.U.L.R. 107; 36 Col. L.R. 868; 22 Wash. U.L.Q. 406; Jean Blanc, Manufacturer's Liability to other than Immediate Vendee, 24 Va. L. R. 134.

In our opinion, the plaintiff's case does not fail for failure to allege and prove privity between the parties.

But it is contended that the evidence fails to show that plaintiff relied upon the alleged warranty. It was not necessary for plaintiff to show by direct evidence that she relied on the alleged warranty. It was sufficient if, from the circumstances shown, reliance thereon fairly appears. The alleged warranty was printed on the box of Tide purchased. It related to a subject likely to attract customers and induce a purchase. Plaintiff made no investigation of the ingredients of the washing powder in question, nor did she rely upon information furnished by others.

As a general rule, no proof of the buyer's reliance on the warranty is necessary other than that the seller's statements are the kind which naturally would induce a purchase. The warranty need not be the sole inducement. Bregman Screen & Lumber Co. v. Bechefsky, 16 N.J. Super. 35, 83 A.2d 804; 1 Williston, Sales, (Rev. Ed.) sec. 206; Mitchell v. Pinckney, 127 Iowa 696, 104 N.W. 286. The issue of reliance was for the jury.

Next, it is urged that plaintiff failed to make a case of breach of warranty for the reason that she failed to show that Tide contained any ingredient or chemical compound injurious to the skin of persons using Tide.

The scope of the warranty in question is limited, as appellant con tends, to the absence in the preparation in question of ingredients injurious to the skin of normal persons using the soap in a normal manner, and the burden was upon plaintiff to bring herself within the class contemplated. Ross v. Porteous, Mitchell & Braun Co., (Me.) 3 A.2d 650.

Although the product here in question was in plaintiff's possession, she produced no analysis of it showing it contained any deleterious substance. Her physician stated as his conclusion that the rash from which plaintiff suffered was caused by the washing powder, but did not identify any noxious element therein; nor did he testify that the washing powder in question was in any way detrimental or injurious to the skin of normal persons. There was positive

evidence to the contrary. Plaintiff introduced in evidence answers made by defendant to interrogatories propounded to it by plaintiff, which answers were to the effect that tests conducted by defendant revealed that said preparation was not injurious to the skin of human beings. This evidence destroyed any procedural presumption, if any, that plaintiff was a person whose skin was normally sensitive to infection or irritation.

If we call upon common knowledge, it is just as reasonable to suppose that plaintiff's injury was the result of an allergy as to speculate that it was caused by a poisonous substance in the washing powder. In such a case, recovery cannot be allowed. Ross v. Porteous, Mitchell & Braun Co., (Me.) 3 A.2d 650; Barrett et al. v. S. S. Kresge Co., (Pa.) 19 A.2d 502.

In our opinion, plaintiff failed to sustain the burden which the law cast upon her to prove that she was one of the class covered by the warranty.

The judgment appealed from is reversed. *Bennick, P.J.,* and *Holman, J.,* concur.