Arthur GIFFORD, a Minor, by and through Marilyn Orlando, his Mother and Next Friend, Respondent,

v.

BOGEY HILLS GOLF AND COUNTRY CLUB, INC., a Corp., Appellant.

No. 52951.

Supreme Court of Missouri, Division No. 1.

April 8, 1968.

———◇———

Burton M. Greenberg, St. Louis, for respondent; London & Greenberg, St. Louis, of counsel.

Dalton & Zollmann, David A. Dalton, Wm. J. Zollmann, III, St. Charles, for appellant.

HIGGINS, Commissioner.

Action for $20,000 damages for personal injuries for negligently furnishing plaintiff a dangerous golf cart. Verdict and judgment were for defendant, but plaintiff received a new trial for errors in connection with Instruction 8 given at defendant's request.

Upon oral argument appellant conceded that the court committed error in giving Instruction 8 and thus waived and abandoned that portion of its brief, leaving only its contention that any such error was harmless because it should have had a directed verdict at the close of the evidence for the reason that "the evidence failed (I) to prove any negligence on the part of defendant which was the proximate cause of plaintiff's injury," and (II) "to prove any knowledge, actual or constructive of the alleged defect prior to plaintiff's injury."

On August 11, 1964, plaintiff, age 14, his stepfather, Joseph L. Orlando, and his stepfather's brothers, Willie and James Orlando, were at defendant Bogey Hills Golf and Country Club, Inc., for the purpose of playing golf on defendant's golf course. Joseph Orlando went to the pro shop and paid $22.00 for rental of two golf carts and registration fees for the foursome. When he came from the pro shop two golf carts had been parked there by defendant's employee, Michael Schwieghauser. No warning was given to plaintiff or the other members of the foursome of any defective brakes on either cart. Willie and James Orlando paired on one cart and plaintiff rode with his father driving the other, which was designated number 5 by defendant. Plaintiff's cart was a Laher electric golf cart, Number 6192MP, equipped with mechanical brakes. It had been used at another country club for three years prior to its purchase by defendant May 5, 1964. Although Orville Hahn, defendant's greenskeeper, said that he checked the brakes on number 5 and found them all right when it was purchased, and that he lubricated and inspected it as a regular procedure about every two weeks, defendant, in answer to an interrogatory, stated no "maintenance, mechanical work, repair jobs or replacement of parts" had been performed by defendant on number 5 between the date of its acquisition and August 11, 1964.

It was Mr. Hahn's duty to maintain golf carts for defendant and they, including number 5, were in service five days a week; however, he had never adjusted the brakes on number 5, did not check its brakes August 11, 1964, and, upon driving number 5 when returned after the accident, admitted that its brakes "could use an adjustment."

Michael Schwieghauser was 14 or 15 years of age on August 11, 1964. He

"helped the pro in the pro shop and cleaned up and stuff like that." As to golf carts he "would just bring them down in the morning." He drove number 5 from the shed to the point where it was delivered to Mr. Orlando. The brakes stopped the cart but he had no occasion to attempt an emergency-type stop. He knew of no check made of the brakes on that morning and he had never adjusted brakes on any of the carts. He was instructed to return carts to the shed if brakes were not working properly.

Joseph Orlando drove cart number 5 until the fifth hole of the first nine. During that time he found that the brakes would not lock the wheels of the cart and would only bring it to a "rolling stop." He had no occasion to make a hard or emergency application of the brakes.

Plaintiff requested permission from his father to operate the cart at the fifth hole. His father asked him to demonstrate his ability to operate the cart which he did to his father's satisfaction. Plaintiff had previous experience with tractors, power mowers and electric carts at amusement parks which were brake-accelerator operated like the golf cart. Plaintiff began driving at the fifth hole and continued until the third hole of the second nine. During the play on that fairway one of plaintiff's uncles lost a golf ball at the bottom of a hill. Plaintiff remained seated on the cart while the others of the foursome looked for the ball. The cart was parked or stopped with the brake fully depressed when it started rolling downhill. Plaintiff removed his foot a bit and then pushed down on the brakes several times with no result. The cart did not stop and crashed through a barbed-wire fence at the bottom of the hill, causing plaintiff to be severely injured.

James Orlando returned cart number 5 to the clubhouse and, in the course of driving it, found there were no operative brakes. He applied the brakes at least three times and, on each occasion, the pedal went to the floor and the brakes gave no resistance. He called this to the attention of Orville Hahn. Mr. Hahn "did go over and attempt to apply the brakes and I don't recall his statement but it was either that there was no brakes or the brakes were bad or the brakes were faulty, something like that."

The brakes were not adjusted in any way following the accident and, on August 13, 1964, Joseph O'Toole, Jr., an investigator for plaintiff, drove the cart and determined that the pedal "went possibly within an inch of the floor," and at no time while he was operating the cart did the brakes lock the wheels or completely stop the cart.

On August 19, 1964, Otto Swyers, Jr., of Auto Damage Appraisers, employed by defendant, tested the brakes on the cart and found "they may have needed an adjustment." He found the cart to have some brake pedal and he skidded its wheels on an asphalt surface.

On August 18 or 19, 1964, Orville Hahn brought the cart to a stop on the hill where plaintiff's accident occurred.

Edward Bilhorn, a consulting engineer, was called as an expert witness by plaintiff. He stated the braking mechanism on the cart in question to be readily accessible for inspection, and that inspection is a simple procedure requiring about two minutes to perform. The function of the mechanical brakes is to lock the wheels of the cart. In answer to a hypothetical question, he stated his opinion that within reasonable engineering certainty the brakes on the cart were improperly adjusted and that this defect had existed for several weeks and could have been determined by an inspection.

Plaintiff made his case on the most favorable view of this evidence, and it was for the jury to say whether the golf cart furnished plaintiff by defendant had inadequate brakes which rendered the cart dangerous; whether defendant knew, or in the exercise of ordinary care should have known, of such dangerous condition; whether plaintiff did not know, in the exercise of ordinary care, of the dangerous condition; whether defendant failed to warn of

such condition; whether defendant was thereby negligent and plaintiff thereby injured and damaged, all as submitted by Instruction 3 (MAI 26.01).

Spelky v. Kissel-Skiles Co., Mo.App., 54 S.W.2d 761, is close in point to plaintiff's case. Plaintiff charged that defendant leased an automobile to one Hoffman and that while riding with Hoffman she was injured as a result of defendant's negligence in furnishing an automobile with defective brakes and a defective accelerator which would stick and cause the automobile to "race." In affirming the award of a new trial to plaintiff after verdict and judgment for defendant, the court observed that "While the evidence is very conflicting, and it may be that the weight is strongly on the side of the defendant, there was enough in the case to submit the question to the jury. * * * There was evidence tending to show that the accelerator did become 'stuck,' and that the accident happened by reason of the car plunging forward, instead of stopping. A clear inference could be drawn that if an inspection had been made to see whether the accelerator was free, that this injury would not have occurred. In other words, the whole case, stripped to the bare bone on this point, is that the plaintiff sought to instruct the jury that it was the duty of the renter of the car to exercise ordinary care in furnishing a safe car, and that the failure to inspect would be some evidence that such care was not exercised, and for that reason * * * the court properly changed its mind on the motion for new trial in holding that the instruction should have been given. * * * the law is that the bailor must use ordinary care to furnish a safe automobile * * *." 54 S.W.2d l.c. 762[3–5]. Slagle v. Singer, Mo., 419 S.W. 2d 9, is also similar to plaintiff's case. Defendants Singer and Dabney submitted as a defense plaintiff's contributory negligence in having tires on the car which he let defendant Singer use which "had worn down," thereby making it dangerous. There was evidence from plaintiff that the tires, although worn, were in usable condition, and

evidence from defendant that they were "slick." Plaintiff said nothing to Singer about the tires and she had had no trouble with tires on previous occasions when using plaintiff's car. The submission was proper under such evidence and on the same theory employed by plaintiff Gifford. 419 S.W.2d l.c. 12[1], citing Spelky v. Kissel-Skiles Co., supra. See also Standard Oil Co. of Ind. v. Leaverton, 239 Mo.App. 284, 192 S.W.2d 681, 682[2], and Anno: 131 A.L.R. 846n; 170 A.L.R. 652n; 46 A.L.R.2d 414n, 444n.

Appellant's argument of failure to show proximate cause is that Mr. Bilhorn, upon whom plaintiff relied to show proximate cause, "testified as to three possible causes for the alleged brake failure, thereby being void of any reasonable degree of certainty to the negligence submitted."

After a comprehensive hypothetical question concerning the brakes on the cart in question, Mr. Bilhorn was asked: "* * * do you have an opinion, within reasonable engineering certainty, as to what defects, if any, there were on this cart? * * *

THE WITNESS: Yes, sir.

"Q What was that defect? A Improper adjustment, primarily. Q You say 'primarily'—there is an inference that there is some secondary defect. A Lack of lubrication is another example or— Q (interrupting) Lack of lubrication? A (continuing)—improper adjustment. Q Improper adjustment— A (interrupting) Yes. Q (continuing)—is your primary? A Yes. Q And lack of lubrication— A (interrupting) Could be another cause for the malfunction.

"Q Any other cause? A An actual disconnecting or a parting of the linkage between the foot pedal and the brake. Q Now, within reasonable engineering certainty, how long would a defect of this kind have existed? A I would say probably several weeks.

"Q Now, is that with reference to the improper adjustment? A Yes. Q And lack of lubrication? A Yes. Q And

the actual parting of the linkage between the brake pedal and the brake? A I would exclude the latter. * * *

"Q Now, with reference to the improper adjustment and lack of lubrication, how could those defects have been determined? A By inspection. Q Now, with reference to this particular cart, what is involved in an inspection of that kind? A Either of two things—one is to set in the seat and depress the pedal and see whether you have a tight pedal. You can push the pedal all the way and lock the wheels. The other would be to raise the rear deck and the cable and the brake backing plate are available within reach. * * * Q How long would it take, in terms of time, to make such an inspection? A Not over two minutes."

This extract demonstrates with reasonable certainty and without resort to guesswork or speculation that the defect in the brakes on the cart was "improper adjustment" which Mr. Bilhorn characterized as the "primary" defect. He specifically "excluded" parting of the linkage between brake pedal and brakes as any part of his opinion on causation, and his evidence on discovery of defect by simple inspection related only to improper adjustment.

Appellant's citations do not support his argument because in Phillips v. Carroll, Mo.App., 413 S.W.2d 583, 586, the testimony of the expert "was in substance that there were numerous things that could cause * * * a rim to explode off of an inflated tire," without supporting any of them with an opinion to a reasonable degree of certainty which, of course, was "not of sufficient probative value as to amount to substantial evidence of improper seating of the rim," 413 S.W.2d 1.c. 587[3]; and in Kane v. Chicago B. & Q. R. R. Co., Mo., 271 S.W.2d 518, 520, "Plaintiff produced no medical evidence whatsoever tending to show the cause of the death of deceased nor in any way tending to connect it with his alleged injury * * * or the claimed failure to render him prompt medical treatment * * *."

Appellant's second argument against submissibility of plaintiff's case is that since there was no evidence that defendant had actual knowledge of any defect, plaintiff had the burden and failed to prove "that a reasonable inspection would have discovered the defect and that Defendant failed to make such a reasonable inspection."

The extract from Mr. Bilhorn's testimony demonstrates not only the primary defect of the cart, improper adjustment of its brakes, but also that it had existed "several weeks," certainly time enough to warrant an inference that routine inspection would have revealed the defect had inspection been performed in the simple manner described by Mr. Bilhorn. Appellant emphasizes his argument by directing attention to testimony from which the jury could find that defendant did regularly inspect its carts; however, in a view of the evidence most favorable to plaintiff, there was evidence from which the jury could infer lack of inspection for a period of time in which, had inspections been made, the improper adjustment of the brakes could have been noted and corrected.

Appellant's citations to this argument also are distinguishable. In Lowes v. Union Electric Co., Mo.App., 405 S.W.2d 506, plaintiff's case failed because his expert "gave no opinion as to the cause of the fire," liability for which plaintiff sought to fasten on defendant. In Orr v. Shell Oil Co., 352 Mo. 288, 177 S.W.2d 608, there was no evidence that defendant's employee knew or should have known of the toxic quality of Shell's chemical to which plaintiff was exposed and therefore no case was made against the employee who directly furnished the chemical to plaintiff. In Greenwood v. Bridgeways, Inc., Mo.App., 243 S.W.2d 111, the only question relevant to this case was the sufficiency of a hypothetical question which was determined to be proper. Oliver v. Oakwood Country Club, Mo., 245 S.W.2d 37, simply affirmed the directed verdict for defendant because the evidence did not warrant a conclusion that defendant's caddie master knew that prospective caddies were shooting an air gun on the golf club prem-

ises, as grounds for holding the club liable to a boy who was shot.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.