Baylie E. KATZ, Appellant,

v.

Jack SLADE and the City of Kansas City, Missouri and Toro Equipment Company, Respondents.

No. 54605.

Supreme Court of Missouri, Division No. 1.

Dec. 14, 1970.

Achtenberg, Sandler & Balkin, Lloyd S. Hellman, Kansas City, for plaintiff-appellant.

Aaron A. Wilson, Jr., Acting City Counselor, Robert A. Dakopolos, Thomas C. Clark, Asst. City Counselor, Kansas City, for respondent.

HOUSER, Commissioner.

This is an action by Baylie E. Katz against Jack Slade, The City of Kansas City and Toro Equipment Company for $20,000 damages for personal injuries alleged to have been sustained while preparing to play golf on the Minor Park Golf Course, a public facility owned and operated by the city. By stipulation the case was dismissed as to defendants Slade and Toro. Following an adverse judgment after a jury trial of his case against the city, Katz has appealed.

The public was invited to use the golf course upon payment of greens fees. The city conducted a pro shop on the premises and owned and rented electric golf carts for use by the general public in playing the game. The fees charged for use of the golf carts were comparable to fees charged by various other golf clubs in the area. The rentals were for short periods of time —for use in playing 9 or 18 holes of golf —and only for use on the golf course. The city maintained, checked and repaired the golf carts. A foursome, for whom Katz paid the greens fees, started to play 9 holes of golf on the city course, using two rented golf carts. Katz and one Snyder drove to the first tee in one of the carts, for which Katz had paid the rental fee. Katz dismounted, went to the back of the car to remove equipment for play from his golf bag which was on the rack at the rear of the cart. Jack Slade, a member of the foursome, paid the rental fee on the second cart (No. 4). Slade and one Cooper left the clubhouse and approached the number one tee, with Slade driving and Cooper riding as a passenger in cart No. 4. Katz was standing behind the other cart, with his back toward the oncoming cart. Slade drove cart No. 4 slightly downhill on the asphalt path provided for the carts, coasted down the incline, and approached the place where Katz was standing. Slade testified that he tried to stop the cart but was unable to do so and the front bumper of cart No. 4 struck Katz in the rear across the calf of both legs; that when he pressed down on the brake pedal there were no brakes; that he pressed the pedal clear to the floor and still had no brakes; that he yelled "No brakes" but it was too late. Cooper testified that when the brakes were applied there was "very limited" effect; there was some deceleration but not to any extent; "it was like dragging." After the accident he drove the cart back to the parking area. When he swung into the parking area he "didn't have much speed" —was going 2 or 3 m. p. h. when 4 or 5 feet from the wall. He pressed the brakes in a "normal hard manner." They did not lock. They had a slowing effect but did not stop the cart, which bumped into the wall. A policeman who was called to the scene took a ride in cart No. 4 after the accident. He testified that in a trip over the same terrain the golf pro, driving the cart, stepped on the brake. There was definitely a brake (the pedal did not go to the

floor). The officer heard the brake engage. "It ground, or a grinding sort of, you could hear it, and then all of a sudden we came to an abrupt stop"; the wheels locked, but the cart "traveled a considerable distance further than it should have." His report stated that "* * * the brakes would stop it, but only after it had traveled a considerable distance with them applied." The officer further testified that the cart went more than 10–15 feet after the brakes were applied before it grabbed and locked the brakes, all of the time making a noise and not braking. Testimony elicited from the city's witnesses indicated that cart No. 4 had been purchased new and had been in use from July 1966 to the date of the occurrence in February, 1967; that the person responsible for the maintenance of the carts was a Mr. Biddle who was not a mechanic; that the club had no one with mechanical ability responsible for testing the carts; that no adjustments had been made on the linkage between the foot pedal and the brake pad calipers; that there had been no occasion before the accident to adjust the linkage; that linkage can get out of adjustment, but that during the time the club had cart No. 4 no check of the linkage had been made; that "the only inspection the man in the morning makes is a visual inspection to make sure the tires are up and he drives it out (on a level place) and stops it."

Paragraph 3 of Katz' petition charged the city with negligent failure to maintain proper care of the cart; failure to check its brakes; failure to maintain proper service records on the cart; renting the cart to Slade with knowledge that the brakes were faulty and unable to stop the cart in an ordinary, reasonable, distance, and were partially or totally inoperative. Paragraph 4 alleged breach of warranty of fitness of use on the part of the city in renting the cart in question. Paragraph 5 charged that the city permitted Slade's use of the cart, for hire, with knowledge that a

golf cart with improperly maintained or faulty breaks is a dangerous instrumentality. Paragraph 6 was based on the theory that the city maintained a nuisance in wrongfully permitting a defective cart to be operated on its premises.

Katz went to the jury on the theory of strict liability in tort by Instruction No. 2, patterned after and adapted from MAI 25.03. At the city's request the court gave Instruction No. 7, as follows: "Your verdict must be for defendant unless you believe the brakes failed on golf cart No. 4 as a direct result of this defendant's failure to exercise ordinary care."

■ Katz' sole point on appeal is that the court erred in giving No. 7 because it erroneously imposed upon Katz the improper burden of establishing failure to exercise ordinary care in a case submitted on the basis of strict liability, and that No. 7 is not a true converse instruction. This point must be sustained under Austin v. Western Auto Supply Co., Mo.Sup., 421 S.W.2d 203, for these reasons: No. 7 purports to but does not converse the elements of unfitness for the intended use and causation. Instead it injects a new and foreign element, i. e., the failure of the city to exercise ordinary care. That element was extraneous to a submission on strict liability. It confused the issue by engrafting onto a submission on strict liability in tort (which is unrelated to any theory of negligence) the question whether the city exercised ordinary care. If Katz had been entitled to submit on the theory chosen the instruction complained of would have imposed upon him a burden not his, for in strict liability in tort all that plaintiff need show is defect and causation (not negligence). This was misdirection of a prejudicial nature because it enabled the jury to determine the case on the basis of a false issue.

There is no merit in the city's suggestion that by the language of paragraph 2 of Instruction No. 2[1] Katz introduced the

1. "Second, defendant knew or should have known by using ordinary care of the use

for which said golf cart #4 was rented, * * *"

standard of ordinary care and therefore Katz actually submitted negligence in failing to exercise ordinary care to eliminate defective brakes. Obviously paragraph 2 referred only to the element of knowledge on the part of the city of the use to which the cart was to be put and did not serve to postulate negligence.

The city, however, urges that under the law and evidence Katz was not entitled to submit his case on the theory of strict liability in tort.

To this writing the beneficiaries of the rule of strict liability in tort in this State have been restricted to the ultimate purchasers, consumers and users of these products.[2] Katz was not a purchaser, consumer or user of the product. He was a bystander. Although he rented a golf cart carrying two of a foursome he did not rent the cart which struck him. Strict liability in tort to this date has been imposed in this State only on manufacturers, food packagers and beverage bottlers, retailers, wholesalers and restaurant operators—those engaged in manufacturing, preparing, distributing, supplying and selling products which endanger the safety or property of the public. It has never been applied in this State to situations involving mutual benefit bailments, leases or rentals of the products of industry. Now Katz calls upon this Court to enlarge the class of beneficiaries who may avail themselves of the rule of strict liability in tort by including bystanders, and to enlarge the class of parties liable thereunder to include others than manufacturers, sellers, etc. and specifically to include lessors. The question before us, therefore, is whether under the circumstances of this case a bystander may recover damages under the doctrine of strict liability in tort from a municipal corporation which is the owner-lessor of a golf cart for injuries sustained when struck while the vehicle is being operated by a third party-lessee, as a result of a defect rendering the vehicle unfit for its intended use.

In determining this question we look to the basic policy reasons underlying the decisions in this State abrogating the requirement of privity of contract in implied warranty cases and imposing strict liability in tort in cases in which that element is absent. Various reasons have been assigned: to reshape the law to conform to the requirements of modern life in the interest of social justice; to modify the harsh results flowing from the rule of *caveat emptor*; to afford justice to the majority of the consumer citizenry whose well-being, health and lives are dependent in great degree upon processed food and manufactured articles, the fitness or safety of which the ordinary consumer knows little other than that the processor or manufacturer holds them out to the public as fit and safe for use; that by so placing their products on the market under modern conditions of retail merchandising, with the use of widespread advertising, manufacturers and suppliers are encouraging purchase of their products and representing to the consuming public that their products are suitable and safe for use; that the burden of losses consequent upon the use of defective articles should be borne by those who can control the danger or make equitable distribution of the losses; that such losses should be borne by manufacturers and sellers marketing the products of industry rather than by injured persons powerless to protect themselves. Keener v. Dayton Electric Mfg. Co., Mo.Sup. (1969) 445 S. W.2d 362 [3]; Morrow v. Caloric Appliance

---

2. We adjudicated the case of a bystander in Hays v. Western Auto Supply Co., Mo.Sup., 405 S.W.2d 877, on the tacit agreement of defendant that the implied warranty extended to that plaintiff.

3. In which this Court expressly adopted the rule of strict liability in tort stated in

2 Restatement Law of Torts, 2d, § 402A, which follows:

"§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his

Corp., Mo.Sup., 372 S.W.2d 41; Worley v. Proctor & Gamble Mfg. Co., 241 Mo.App. 1114, 253 S.W.2d 532; Madouros v. Kansas City Coca-Cola Bottling Co., 230 Mo. App. 275, 90 S.W.2d 445. See Comments c. and f. following § 402 A., Restatement Law of Torts 2d, for a condensed résumé of the underlying policy reasons.

Several courts in other jurisdictions have passed upon the question whether the rule of strict liability should be extended beyond manufacturers, suppliers, etc. In Cintrone v. Hertz Truck Leasing, etc. (1965) 45 N.J. 434, 212 A.2d 769; McClaflin v. Bayshore Equipment Rental Co. (1969) 274 Cal.App.2d 446, 79 Cal.Rptr. 337, and Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722, the rule of strict liability in tort was extended to include bailors and lessors. The New Jersey and California courts, seeing no essential difference between sellers of personal property and lessors of personal property, employed the same policy considerations used to justify imposition of strict liability in tort upon manufacturers, sellers, etc. The leases involved in the New Jersey and California cases were made in the course of active, full-time marketing as a part of a going business and not on a casual basis. The lessors in those cases were typical commercial-type lessors engaged in the business of distributing goods to the public. They placed the leased articles on the market and, as the New Jersey court expressed it, put the leased vehicles "in the stream of commerce not unlike a manufacturer or retailer." They were "an integral part of the overall * * * marketing enterprise that should bear the cost of injuries resulting from defective products," McClaflin, supra, and were in a position to

recover the cost of protecting the public by charging for it in their business through an adjustment of the rental. They were said to expose the bailee and others to a greater risk from defective vehicles than usually arises out of sales by the manufacturer. In Price, supra, the court found no difficulty in applying the doctrine to the lessor of motor vehicles "In today's society with 'the growth of the business of renting motor vehicles, trucks and pleasure cars' (*Cintrone, supra*) and the persistent advertising efforts to put one 'in the driver's seat' (*id.* at p. 777) * * *." 85 Cal. Rptr., 1 c. 183, 466 P.2d l. c. 727.

In Lechuga, Inc. v. Montgomery (1970) 12 Ariz.App. 32, 467 P.2d 256, the majority opinion found it unnecessary to pass upon the question, but a judge concurring in the result stated his views favoring expansion of the rule to lessors, listing eight policy reasons, and reasoning that the nature of the defect and not the nature of the transaction is the matter of importance; that is, whether the defect is the result of either design or manufacture.

No instance has been found in which this extension of the rule has been applied to a municipally-owned, noncommercial, nonprofit amusement facility maintained for the use of the public.

In two cases other courts have refused to extend the rule to include parties other than sellers. In Speyer, Inc. v. Humble Oil & Refining Co. (1967) W.D.Pa., 275 F.Supp. 861, aff'd (1968) 3d Cir., 403 F.2d 766; plaintiffs sued the oil company for property damages arising out of a fire caused by a defective gasoline pump which the company had purchased from plaintiffs and leased back to them. The court held

---

property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
  (a) the seller is engaged in the business of selling such a product, and
  (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although
  (a) the seller has exercised all possible care in the preparation and sale of his product, and
  (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

that Humble was not in the business of selling pumps and was not a "seller" within the meaning of § 402A of the Restatement. In Freitas v. Twin City Fisherman's Cooperative Ass'n (1970) Tex.Civ.App., 452 S. W.2d 931, a truck driver fell when a ladder and platform leading to the top of an oil tank which he was filling suddenly moved. The ladder was constructed by an independent contractor employed by Gulf Oil Company, which leased it to Twin City. The court held that the rule of strict liability does not apply to persons who merely construct items but are not engaged in the business of selling them; that Gulf was not in the business of selling tanks, ladders or platforms; that there must be a sale before strict liability can be imposed; and indicated that the transaction by which the product is transmitted into the stream of commerce must be essentially commercial in character.

In this background we find no compelling reasons to impose absolute liability upon the city. Under the circumstances of this case we adhere to the previous holdings restricting the application of the rule of strict liability in tort to mass producers and distributors of the products of industry. In other jurisdictions where the rule has been extended to lessors they have been mass lessors[4] placing their products in the stream of commerce as an integral part of the over-all marketing enterprise. They have been commercial distributors on a large scale engaging in profit-making businesses organized for economic gain. They have advertised widely, holding out their offerings as suitable and safe for use by members of the public who are relatively powerless to protect themselves. In contrast this is a municipally operated, nonprofit, recreational and amusement facility—a golf course. Golf carts are supplied to those patrons who desire to use them, as a casual operation, a

strictly incidental and collateral convenience. They are rented for use solely on the golf course, for short periods of time, for small fees. There is no indication that patrons are stimulated or induced to rent by widespread advertising. There is no element of forced reliance by the patron, or that there is anything to prevent the prospective user from inspecting or trying out the carts before hiring one. It may not in any realistic sense be said that this is an operation essentially commercial in character, or that this is a "marketing" of these carts, or a mass leasing of them as a part of the over-all marketing enterprise, or a commercial distribution by a profit-making concern to a public forced to depend upon the representation of the city that the carts are suitable and safe for use. The transaction more closely resembles a license than a lease; the "renter" is more like the patron who buys a ticket to ride on a merry-go-round than he who leases a Hertz Drive-Ur-Self automobile for a weekend or a week of travel on the public highways. Traditionally the law has imposed upon proprietors of places of public amusement the duty of exercising the degree of care reasonably commensurate with the character of the amusement or game presented or played within the place, but they have not been held to be insurers of the safety of invitees, Thompson v. Sunset Country Club, Mo.App., 227 S.W.2d 523, and numerous cases cited on page 525; 26A Mo.Dig. Theaters and Shows, ⚷6(2), and we see no reason to disturb this salutary rule. The rights of persons injured by golf carts in the circumstances of this case will be fully protected by affording them relief under the established rules of liability for negligence which have heretofore governed such transactions. Gifford v. Bogey Hills Golf and Country Club, Inc., Mo.Sup., 426 S.W.2d 98; Schamel v. St. Louis Arena Corp., Mo.App., 324 S.W. 2d 375.

---

4. Conroy v. 10 Brewster Ave. Corp., 97 N.J.Super. 75, 234 A.2d 415, holds that Cintrone v. Hertz Truck Leasing, etc. supra, applies only to the "mass producer" or the "mass lessor."

Since in this case the city is not subject to the rule of strict liability in tort we do not decide the further question whether bystanders may avail themselves of the rule. The curious are referred to Elmore v. American Motors Corp. (1969) 70 Cal.2d 578, 615, 618, 623–624, 75 Cal.Rptr. 652, 451 P.2d 84; Darryl v. Ford Motor Co. (1969) Tex.Sup., 440 S.W.2d 630; Elmore v. American Motors Corp. (1969) 75 Cal. Rptr. 652, 451 P.2d 84; "Strict Products Liability and the Bystander," (1964) 64 Columbia Law Review 916, and Comment on Caveat o. following 2 Restatement Law of Torts 2d § 402A, p. 356.

■ The question remains as to the proper disposition of this appeal. Katz made several assignments of primary negligence in his petition in addition to the charge of breach of warranty. The evidence discloses a submissible case of primary negligence. Katz' counsel and the court evidently misconceived the law and submitted the case to the jury in the mistaken belief that the rule of strict liability in tort was applicable. This appears to have been misadventure based upon a mistaken legal theory in a situation akin to that ruled on in Blaser v. Coleman, 358 Mo. 157, 213 S.W.2d 420, and East v. McMenamy, Mo.Sup., 266 S.W.2d 728, rather than an abandonment of his primary negligence assignments to secure a strategic advantage, as found in Smith v. St. Louis Pub. Serv. Co., 364 Mo. 104, 259 S. W.2d 692; Hunt v. Chicago, M., St. P. & P. R. Co., 359 Mo. 1089, 225 S.W.2d 738, and Stone v. Farmington Aviation Corp., 363 Mo. 803, 253 S.W.2d 810. In the exercise of our discretion we remand the case for trial of the issues on primary negligence, notwithstanding Katz abandoned for the time being his charges of primary negligence. Blaser v. Coleman (en banc), supra.

Judgment reversed and cause remanded for a new trial.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., and HOLMAN, J., concur.

BARDGETT, J., concurs in result in separate opinion filed.

BARDGETT, Judge (concurring in part and dissenting in part).

I concur in the final result of reversal and remand in this case because of error in instruction No. 7. I respectfully dissent from that portion of the majority opinion which holds that this cause is not one of strict liability in tort, as it is my view that strict liability in tort does apply to this case.