Clyde D. GABBARD, Plaintiff-Appellant,

v.

STEPHENSON'S ORCHARD, INC., Defendant-Respondent.

No. KCD 28460.

Missouri Court of Appeals, Kansas City District.

April 3, 1978.

Motion for Rehearing and/or Transfer Denied May 1, 1978.

Application to Transfer Denied June 15, 1978.

Stephen G. Scholl, Thomas J. Conway, Popham, Popham, Conway, Sweeny & Fremont, P. C., Kansas City, for plaintiff-appellant.

Richard H. Heilbron, Heilbron & Powell, Kansas City, for defendant-respondent.

Before ROBERT R. WELBORN, Special Judge Presiding, SHANGLER, J., and ANDREW J. HIGGINS, Special Judge.

ANDREW JACKSON HIGGINS, Special Judge.

Appeal from judgment for defendant on verdict directed at the close of plaintiff's case in action for damages for personal injuries sustained as a result of the collapse of a ladder. The question is whether, under the law and the evidence, plaintiff was entitled to have his case against defendant submitted to the jury under the theory of strict liability. Reversed and remanded.

Plaintiff's action was against Stephenson, the supplier, and O'Connor Ladder Co., Inc., the manufacturer of the ladder. He alleged: that on September 30, 1971, he was a business invitee on premises owned and operated by Stephenson; that Stephenson furnished him a ladder manufactured by O'Connor; that the ladder was of defective design and construction; and, as a result, the ladder collapsed and plaintiff was injured.

On the morning of September 30, 1971, plaintiff read a newspaper advertisement [1] inviting the public to pick apples at Stephenson's Orchard. He left home around 10:30 a. m., and went directly to the orchard. At the time of his injury, he was using a three-legged aluminum ladder. He shook the ladder before he mounted it and it seemed firm. He climbed to the third step from the top (the fifth step from the bottom) and was looking and reaching upward for apples, picking with his right hand and putting them in a bucket sitting on the top step, when he felt the ladder going, causing him to fall. He crawled to his car, drove to the main gate where he reported the accident and paid for the apples he had picked, and then drove to the main house at the Orchard, from which he was driven to a hospital.

Prior to the fall, the ladder was sitting on dry, hard ground; none of the steps was loose as he climbed them. When the ladder went out from under him, he thought it went forward or frontwards. It went straight down but he did not land on any part of the ladder, and it was to the side of him after the fall. He observed the ladder part with its steps flat on the ground; he did not recall the location of the third leg. He did not notice any part of it to be bent. Before he mounted the ladder, the third leg was four or five feet away from the two front or step legs. He did not lose his balance until after the ladder started down; he did not jump. He assumed the ladder bent or broke, but did not know because he did not inspect it after it went down; he did not touch the ladder after the accident.

He was not instructed in the use of the ladder and he did not know it was danger-

1.   APPLES—YOU PICK
JONATHAN—ROME
RED & GOLDEN DELICIOUS
OPEN 9 A.M. TO 5:30 P.M.

STEPHENSON'S ORCHARD
3 mi. S. of 40 Hwy. on Lee's Summit Rd.

ous. He had never climbed such a ladder before and did not ask for instructions on its use. He could have asked the gate man for instructions; he had plenty of time to inspect. All he knows is that he was reaching upward and the ladder went out from under him. He did not lean out to the right or left of the ladder.

Stephenson had 31 such ladders which it supplied to its business invitees, all of which were manufactured by O'Connor and acquired by Stephenson between 1964 and 1969. The ladder used by Mr. Gabbard was two or three years old at the time of his accident.

Theodore Clemens had a similar accident August 13, 1970, while picking peaches at Stephenson's. He was halfway up a similar three-legged ladder, reaching upward with one hand, when the ladder collapsed. He went one way; the ladder the other. He also had shaken the ladder before climbing it, and it seemed sturdy. His recollections were that the ladder tipped sidewise; that a tripod ladder has a tendency to collapse, and that it will rock more than a four-legged ladder. He did not overbalance it by leaning out one way or the other.

Elizabeth Sellars, age 68, fell from a similar ladder at Stephenson's in August, 1971. She ascended the ladder to about the third step. It started to tip; she fell to the right and jumped. She had never seen a three-legged ladder before. She felt such a ladder would balance better if it had two back legs.

Dorothy Perdue fell from a three-legged ladder at Stephenson's in September, 1971. She was at the second step when it twisted and went out from under her.

Norman Stephenson, president of Stephenson's, inspected the place where Mr. Gabbard's accident happened. He found five three-legged ladders in the area, but only the one used by plaintiff was down. It was lying down with the pole leg straight out in front of it. There were no broken ladders present; the area was grassy and dry.

If there is help in the orchard, Stephenson's instructs its customers on the use of the three-legged ladders. On the day of Mr. Gabbard's accident, only the gate man was present. Customers did not have to use the ladders, but they were necessary to reach the high apples. Failure to pick the high apples resulted in less profit.

Stephenson's ran the "You Pick" advertisement daily during the 1971 picking season to attract people to the orchard to pick apples so that Stephenson's would make a profit. The profit depended on the apples being picked.

Willard S. Norton, an industrial engineer, prepared for his testimony by visiting apple orchards near Lexington, Missouri. He checked a number of three-legged ladders and one built especially for apple picking that did not employ the third or pole leg concept. One was a rocket-shaped ladder in use around Lexington which he thought to be safe and stable for orchard use. He examined the ladder used by Mr. Gabbard and found that the third or pole leg canted to one side so that a climber in normal usage would cause the ladder to go sidewise to the right. The ideal location of the pole leg would be in the center; the ladder in question was kicked over to the right. He observed also that the left leg of the ladder was crippled in that it was about three inches out of line. Such defects would cause the ladder to tip. The top of the ladder points in a different direction from the bottom.

The three-legged ladder in question falls within the classification "stepladder" in "American National Standard Safety Requirements for Portable Ladders," requiring a spreader to make the structure stable so that the back legs would not slide out from under it. The vertical force of a climber will cause the three-legged ladder to flatten out. With the third leg minus a locking device and resting on hard ground, there is no resistance to a slide of the third leg; a spiked point would be more suitable. Mr. Norton would not recommend a three-legged stepladder for experienced or inexperienced users because of lack of spreaders

and the tendency to tip as compared to a four-legged ladder. It was his opinion that the ladder in question has poor engineering design, is unsafe, and dangerous to use. If the pole leg is not properly placed, it is liable to slip out from under a climber because of the lack of a spreader. The spreader or locking device would prevent use by positioning over the crotch of a tree.

Henry Vollenweider, manager of Kerr Orchards at Lexington, Missouri, has ceased using three-legged ladders. He uses two-legged ladders, some with open and some with pointed ends. Such ladders are laid into the tree against a stable limb, and workers are not apt to fall. Three-legged ladders need not be placed into the trees and give the advantage of fewer apples knocked to the ground.

Plaintiff's case against O'Connor went to the jury and resulted in a verdict for that defendant. Plaintiff's motion for new trial charged error in sustaining Stephenson's motion for directed verdict at the close of plaintiff's case and asserted trial errors against O'Connor's verdict. The motion for new trial was overruled. An appeal was taken which has since been dismissed as to O'Connor.

The trial court sustained Stephenson's motion for directed verdict at the close of plaintiff's case "on the basis of the case of *Katz versus Slade*." (*Katz v. Slade*, 460 S.W.2d 608 (Mo.1970).)

Appellant contends that the rule of strict liability is properly extended to persons other than users and consumers; and that plaintiff should be accorded benefit of the rule in the facts of this case. He recognizes the denial of application of the rule in *Katz v. Slade*, supra, but argues for a distinction on the facts supported by cases from other jurisdictions.

Respondent asserts that plaintiff would have this court hold that a lessor or bailor for a mutual benefit in a commercial transaction comes under the rule of strict liability irrespective of a sale. It contends that the rule of strict liability has not been so extended in Missouri to cover this case; and, in reliance on *Katz v. Slade*, supra,

argues that the court should not do it against this defendant.

*Keener v. Dayton Electric Mfg. Co.*, 445 S.W.2d 362 (Mo.1969), an action by a widow against a wholesale distributor for wrongful death of her husband electrocuted while attempting to repair a friend's allegedly defective sump pump, reviewed the law involving products liability, and adopted the rule of strict liability in tort stated in 2 Restatement, Law of Torts, Second, § 402A:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) The seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

*Giberson v. Ford Motor Co.*, 504 S.W.2d 8 (Mo.1974), an action against automobile manufacturer for damages arising from an accident allegedly precipitated when the motor of an automobile sold by defendant exploded, creating a cloud of steam, smoke, and gas which restricted vision of other drivers to such an extent that a multiple automobile collision occurred, extended the rule of strict liability to protection of bystanders who were not purchasers of the defective chattel.

*Katz v. Slade*, supra, involved a municipal golf course which supplied electric golf carts for a fee. Plaintiff was injured when the brakes on Slade's cart failed and it struck him. The question posed by the court was "whether * * * a bystander may recover damages under the doctrine of strict liability in tort from a municipal cor-

poration which is the owner-lessor of a golf cart for injuries sustained when struck while the vehicle is being operated by a third party-lessee, as a result of a defect rendering the vehicle unfit for its intended use." 460 S.W.2d l. c. 611. The court recognized that in several other jurisdictions the rule of strict liability in tort was extended to include bailors and lessors, but proceeded to denial of extension of the rule to Mr. Katz by an observation that "[n]o instance has been found in which this extension of the rule has been applied to a municipally-owned, noncommercial, nonprofit amusement facility maintained for the use of the public." 460 S.W.2d l. c. 612.[2] See also *Giberson v. Ford Motor Co., supra,* 504 S.W.2d l. c. 10, in its observation that *Katz v. Slade* "determined that liability under the rule should not be imposed on defendant city, a lessor, for the 'non-commercial' rental of a defective golf cart on a municipal course."

In finding "no compelling reasons to impose absolute liability upon the city," *Katz v. Slade,* supra, l. c. 613, provided the distinction of its facts from those in Mr. Gabbard's case: " * * * this is a municipally operated * * * facility—a golf course. Golf carts are supplied to those patrons who desire to use them, as a casual operation, a strictly incidental and collateral convenience. They are rented for use solely on the golf course, for short periods of time, for small fees. There is no indication that patrons are stimulated or induced to rent by widespread advertising. * * * It may not in any realistic sense be said that this is an operation essentially commercial in character * * * or a commercial distribution by a profit-making concern to a public forced to depend upon the representation of the city that the carts are suitable and safe for use."

In contrast, the ladders furnished by Stephenson's were placed in its orchard as part of its profit-oriented operation. Stephenson's advertised its "You Pick" feature to induce customers to come to its orchard for the purpose of picking apples, and use of ladders was an integral part of such operation. Stephenson's advertised to attract pickers so that it could make a profit; and the more apples picked, the greater the profits. The ladders enabled pickers to pick from higher parts of the trees; and without ladders, apples in the higher branches would have to be picked by employees or allowed to fall. Again, employee picking and waste reduced profits which could be realized upon customer picking. Thus, Stephenson's had a profit motive, as opposed to Kansas City's "noncommercial, nonprofit amusement facility"; and its furnishing of ladders was interwoven with its sales of apples, as opposed to Kansas City's golf carts furnished as a "strictly incidental and collateral convenience."

Mr. Gabbard did not pay a specific rental for the ladder furnished him, but under the "You Pick" arrangement, part of Stephenson's profits came from Mr. Gabbard's use of a ladder. Thus, there was a rental of ladders in that the cost of furnishing ladders was indirectly charged to its customers in the cost of apples picked. The arrangement involving Mr. Gabbard was the same as that prevailing for a number of years, and consequently not a collateral, casual, or incidental convenience. Cf. *Browning Ferris Ind., Etc. v. Baden Tire Ctr.,* 536 S.W.2d 203 (Mo.App.1976).

■ The facts in this case with their contrast to those in *Katz v. Slade,* supra, provide a basis for imposing absolute liability upon Stephenson's as a bailor or lessor of a defective product in the usual course of its business, i. e., a lessor or bailor for the mutual benefit of the parties in a commercial transaction comes under the rule of strict liability irrespective of a sale. Such application of the rule of strict liability is supported by cases from other jurisdictions: *Fulbright v. Klamath Gas Co.,* 271 Or. 449, 533 P.2d 316 (1975), an action by injured farmhand against defendant gas companies

---

**2.** *Katz v. Slade,* supra, was adopted by Division No. 1 of the Supreme Court with one judge dissenting who would hold the case to be one

of strict liability in tort. See also *Blevins v. Cushman Motors,* 551 S.W.2d 602 (Mo. banc 1977).

for injuries sustained while using defendant's potato vine burner which the gas companies furnished to plaintiff's employer to promote the sale of its propane gas; *Price v. Shell Oil Co.*, 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (banc 1970), an action by mechanic employed by airline, lessee of gasoline truck, against oil company, lessor of truck, for injuries received when legs on movable ladder mounted on tank split and mechanic fell; *Perfection Paint & Color Co. v. Konduris*, 147 Ind.App. 106, 258 N.E.2d 681 (1970), an action against gratuitous supplier of lacquer reducer to recover for death of employee, killed when reducer became ignited; *Delaney v. Towmotor Corp.*, 339 F.2d 4 (2 Cir.1964), an action to recover for injury from a defective overhead guard, brought by employee of prospective purchaser to which the lift had been loaned for demonstration; *McClaflin v. Bayshore Equipment Rental Co.*, 274 Cal.App.2d 446, 79 Cal.Rptr. 337 (1969), an action for wrongful death resulting from accident involving stepladder against lessor of stepladder; *Garcia v. Halsett*, 3 Cal.App.3d 319, 82 Cal.Rptr. 420 (1970), an action against owner of launderette for injuries sustained by user of coin-operated washing machine when he inserted his hand into the machine. See also *Bachner v. Pearson*, 479 P.2d 319 (Alaska 1970); *Stewart v. Budget Rent-A-Car Corp.*, 52 Hawaii 71, 470 P.2d 240 (1970).

As stated, *Perfection Paint & Color Co. v. Konduris*, supra, 258 N.E.2d l. c. 686- 688: "The accomplishment of the Restatement's stated objectives and the protection which flows therefrom is not dependent upon a 'sale.' * * * To limit the rule to only those situations in which there has been an actual sale would be to circumscribe the rule to such an extent that its purpose might be defeated. * * * The label * * *, gratuitous furnishing, is not of great significance; the nature of the transaction serves as the basis of strict liability in tort and not the name by which it is called. In protecting the consumer, the rule of strict liability in tort attaches to products which are placed in the stream of commerce." *Price v. Shell Oil Co.*, supra,

also perceived no difference between sellers of personal property and nonsellers, such as bailors and lessors. "In the light of the policy to be subserved, it should make no difference that the party distributing the property has retained title to it. * * * [I]t makes. good sense to impose on the lessors of chattels the same liability for physical harm which has been imposed on the manufacturers and retailers." 466 P.2d l. c. 726. "Lessors of personal property, like the manufacturers or retailers thereof, 'are engaged in the business of distributing goods to the public. They are an integral part of the overall * * * marketing enterprise that should bear the cost of injuries resulting from defective products.' " *McClaflin v. Bayshore Equipment Rental Co.*, supra, 79 Cal.Rptr. l. c. 340.

Judgment in favor of defendant Stephenson's Orchard, Inc., reversed; cause remanded.

All concur.